UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DARNELL WILLIAMS,

                          Plaintiff,

                                                    5:22-CV-0067
v.                                                  (GTS/MJK)

CITY OF SYRACUSE; DETECTIVE KAITLIN
HENDERSON; SERGEANT ALEX CAZZOLLI;
DETECTIVE MICHAEL SHANNON; and
DETECTIVE CHAD PICOTTE,

                          Defendants.
_____

APPEARANCES:                                OF COUNSEL:

SIVIN, MILLER & ROCHE LLP                    EDWARD SIVIN, ESQ.
   Counsel for Plaintiff                     DAVID ROCHE, ESQ.
20 Vesey Street, Suite 1400                  DUANE G. BLACKMAN, ESQ.
New York, NY 10007                           GLENN D. MILLER, ESQ.

CORPORATION COUNSEL                          TODD M. LONG, ESQ.
CITY OF SYRACUSE                             DANIELLE R. SMITH, ESQ.
   Counsel for Defendants
233 East Washington Street, 300 City Hall
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

**<u>DECISION and ORDER</u>**

Currently before the Court, in this civil rights action filed by Darnell Williams

("Plaintiff") against the City of Syracuse, Detective Kaitlin Henderson, Sergeant Alex Cazzolli,

Detective Michael Shannon, and Detective Chad Picotte ("Defendants"), is Defendants' motion

for summary judgment pursuant to Fed. R. Civ. P. 56.   (Dkt. No. 50.)   For the reasons set forth

below, Defendants' motion is granted, and Plaintiff's Amended Complaint is dismissed.

**I.      RELEVANT BACKGROUND**

### A.     Plaintiff's Amended Complaint

Generally, in his Amended Complaint, Plaintiff asserts six claims: (1) a claim that all Defendants subjected him to false arrest and/or false imprisonment pursuant to New York law ("First Claim"); (2) a claim that all Defendants subjected him to malicious prosecution pursuant to New York law ("Second Claim"); (3) a claim that Defendants Henderson, Cazzolli, Shannon, and Picotte subjected him to unreasonable search, false arrest, and malicious prosecution pursuant to the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983 ("Third Claim"); (4) a claim that Defendants Henderson, Cazzolli, Shannon, and Picotte denied his right to a fair trial by fabricating evidence and withholding exculpatory evidence pursuant to 42 U.S.C. § 1983 ("Fourth Claim"); (5) a claim that Defendants Henderson, Cazzolli, Shannon, and Picotte failed to intervene to prevent or stop the illegal acts of their fellow officers pursuant to 42 U.S.C. § 1983 ("Fifth Claim"); and (6) a claim that Defendants Henderson, Cazzolli, Shannon, and Picotte withheld exculpatory evidence in violation of the Fourteenth Amendment of the United States Constitution and *Brady v. Maryland*, 373 U.S. 83 ("Sixth Claim").   (Dkt. No. 11.)   The factual circumstances underlying Plaintiff's Amended Complaint will be discussed in more detail below in Part I.C. of this Decision and Order.

### B.     Relevant Procedural History

Plaintiff filed this action on January 25, 2022.   (Dkt. No. 1.)   In response to a motion to dismiss filed by Defendants on February 22, 2022, Plaintiff filed an Amended Complaint on March, 2, 2022, and this Court granted Defendants' subsequent request to withdraw their motion on March 4, 2022.   (Dkt. Nos. 9, 11, 13, 14.)   Defendants filed a motion to dismiss the Amended Complaint on April 27, 2022.   (Dkt. No. 16.)   On January 27, 2023, the Court denied

2

that motion.   (Dkt. No. 34.)   Following discovery, Defendants filed the current motion on

August 9, 2024.   (Dkt. No. 50.)

> ### C.    Undisputed Material Facts on Defendants' Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a

response to the moving party's Statement of Material Facts that "shall mirror the movant's

Statement of Material Facts by admitting and/or denying each of the movant's assertions in a

short and concise statement, in matching numbered paragraphs," supported by "a specific

citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement

is not a mere formality; rather "this and other local rules governing summary judgment are

essential tools intended to relieve the district court of the onerous task of hunting through

voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021

WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F.

Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's

statement of material facts streamlines the summary judgment analysis 'by allocating

responsibility for flagging genuine factual disputes on the participants ostensibly in the best

position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v.

Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The

Court may deem admitted any properly supported facts set forth in the Statement of Material

Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported

by record citations by Defendants, and either expressly admitted or denied without a supporting

record citation by Plaintiff. (*Compare* Dkt. No. 50, Attach. 58 *with* Dkt. No. 60.)

**Attempted Abduction of T.P. on Monday, March 2, 2020**

1.    On Monday, March 2, 2020, at 9:10 AM, Stanyelle Jones ("Ms. Jones") called 911 stating that a man had attempted to abduct her nine-year-old daughter, T.P., while she was waiting for her bus at the bus stop on the corner of Landon Avenue and Borden Avenue ("Incident Location") in the City of Syracuse, New York.

2.    T.P. was able to get away from the attempted abductor and was with Ms. Jones when Ms. Jones called 911.

3.    Ms. Jones told the 911 operator that her daughter could not "really tell" how old the attempted abductor was, but described him as "tall wearing a red jacket . . . he looked like he was mixed, he had a hood on," was "light-skinned," and had a black moustache.

4.    Ms. Jones told the 911 operator that the attempted abductor had "some sort of weapon," but that T.P. "couldn't really see it."

5.    According to Ms. Jones, the attempted abduction occurred "like fifteen to twenty minutes" minutes before her 911 call.

6.    Ms. Jones stated that T.P. saw the attempted abductor walking toward McLennan Avenue.

7.    Syracuse Police Department ("SPD") Officer Chad King responded to the home of Ms. Jones and T.P. at approximately 9:31 AM and spoke to T.P.

8.    Officer King was accompanied by SPD Officers Joel Dorchester and Kristie Froio.

9.    During an initial interview of T.P. and her mother by responding SPD officers, a portion of which was captured on Body Worn Camera ("BWC"), T.P. stated that the attempted

4

abductor was wearing a red coat/jacket, "looked like he . . . was in his teens or twenties," was light-skinned, "like Puerto Rican," was wearing jeans, had a moustache, and had a red hood up over his head.

10.     T.P. explained that, after the attempted abduction, the attempted abductor walked "straight," which her mother explained was towards McLennan Avenue.

11.     After looking at her phone, T.P. told the officers that she called her mother at "9:04," meaning that was the time of the incident.

12.     However, T.P.'s statement was inconsistent with her mother's statement to 911 at 9:10 AM that the incident had occurred 15-to-20 minutes earlier. Sergeant Cazzolli would later determine that the actual call was at 8:57 AM based on the call logs on Ms. Jones' phone.[1]

13.     The SPD officers did not ask T.P. whether the attempted abductor had a Southern drawl or accent.

14.     T.P. did not independently state whether the attempted abductor had a Southern drawl or accent.

15.     The SPD officers did not ask T.P. whether the attempted abductor had caps or plating on his teeth.

16.     T.P. did not independently state whether the attempted abductor had caps or plating on his teeth.

---

[1]     Plaintiff denies this asserted fact, raising issues related to when Defendants sought to obtain Ms. Jones' phone log records.   (Dkt. No. 60, at ¶ 12.)   However, this denial does not cite any admissible record evidence contradicting the fact that Ms. Jones' statement regarding the timing of the incident in her 911 call differed from T.P.'s statement that her call to Ms. Jones had occurred at 9:04 AM, nor does this denial cite any admissible record evidence related to why Sgt. Cazzolli eventually obtained Ms. Jones' phone logs, which is that they showed that T.P.'s call occurred at 8:57 AM.   This fact is therefore deemed to be admitted.

17.    Officer King documented his interview of T.P. in a report, stating that, "at approximately 0900hrs, . . . she [T.P.] was standing at the intersection of Landon [Avenue] and [West] Borden [Avenue], waiting for her school bus . . . [when] an unknown, light skinned male walked across the street, approached her and stated to her, 'Come with me.'"    T.P. responded with "No!"    The "male then physically grabbed onto her arm/sleeve area and began to escort her away from the bus stop.    She then stated that while doing this, she was able to use her phone and call her mother adding that the male then released his grip on her and ran off, heading north on Landon [Avenue] towards McClennan [Avenue]."    T.P. then "ran home to and met with her mother, Stanyelle Jones, where they then called 911 for police assistance."[2]

18.    Officer King's report, like all SPD reports, is affirmed under penalty of perjury.

19.    According to Officer King's report, T.P. "described the suspect as a light skinned male, approximately in his early 20's, wearing a red colored hoodie, blue jeans, and had a moustache.    She also stated that the suspect had his hoodie over his head and she was unable to see his face."

20.    Criminal Observation and Protection System ("COPS") Cameras are "law enforcement sensitive cameras used to assist in investigations, and they are placed in high traffic

---

[2]    Plaintiff admits the asserted fact but denies "any suggestion that officer King documented his entire interview with T.P.," emphasizing that "Officer King did not document the time T.P. stated she called her mother."    (Dkt. No. 60, at ¶ 17.)    However, the asserted fact does not state that the report documented the entire interview.    Moreover, Plaintiff's attempt to deny an implied fact does not render anything about the asserted fact disputed.    *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).    In any event, the Court notes that, although Officer King did not document the exact time T.P. stated she called her mother during the relevant interview, he did document that the incident occurred at "approximately 0900hrs." This asserted fact is deemed to be admitted.

areas."

21.     COPS Camera footage is kept for only 30 days.

22.     The COPS Camera operator can change the angle or direction of a COPS Camera during a live feed, but not a recording.

23.     A viewer can zoom in regardless of whether the video is live or recorded.

24.     Officer King spoke with "unit 77 Greco," who operated the COPS Camera system.   According to King, while he was speaking with Greco, "she stated that she view[ed] a light skinned male, wearing a read [sic] hoodie, facial hair, and a black hat in the area of Kirk Park after the incident, at approximately 0901 hrs."

25.     The responding officers conducted an extensive search in the area but they were unable to locate anyone matching the suspect[']s description.

26.     An attempt to identify bulletin was requested with the Onondaga Crime Analysis Center utilizing the images obtained from the COPS Camera footage.

27.     The photographs included in the bulletin are reproduced below:



28.     The bulletin described the COPS Camera suspect as "Light skinned W/M or HM, late teens to early 20s."

29.     Based on the bulletin, Sgt. Fieldson of the North Syracuse Police Department subsequently contacted the City's Criminal Investigations Division ("CID") and provided the name of Gordon Vnek as possibly being the suspect involved in the incident.   Sgt. Fieldson advised that he was familiar with Vnek and stated that Vnek had been involved in other similar incidents.

30.     The Village of North Syracuse is a separate municipality from the City of Syracuse with its own distinct police force.

31.     CID Detective Nichola Stuper conducted a CNY Leads and CHAIRS2 search and confirmed that Vnek had been involved in several other incidents where he was around young girls in a suspicious manner and was involved in one other attempted abduction.

32.     Detective Stuper also reviewed footage obtained from the IBB Mini Mart at 1434 Midland Avenue in Syracuse, New York from 8 AM on March 2, 2020, which was approximately one hour before the attempted abduction.

33.     According to Detective Stuper, the IBB Mini Mart footage "revealed that an individual, [who] appear[ed] to be the suspect, approache[d] the store from [West Beard Avenue] and enter[ed] at 0801 hours.   The suspect then exit[ed] the store at 0803 hours and walk[ed] north on Midland [Avenue] and then walk[ed] east on [West Beard Avenue]."[3]

---

[3]     Plaintiff admits the asserted fact but denies "the suggestion that the SPD had sufficient information at that point to make a determination that the individual in the video, whom defendants later identified as Plaintiff, 'appeared to be' the individual who attempted to abduct T.P. "   (Dkt. No. 60, at ¶ 33.)   However, the asserted fact does not state that the SPD had such information and/or made any such determination.   Moreover, Plaintiff's attempt to deny an implied fact does not render anything about the asserted fact disputed.   *Yetman*, 2015 WL

34.   The investigation was then turned over to SPD's Abused Person's Unit ("APU").

**Investigations by APU**

35.    At the time of the attempted abduction, Detective Henderson was assigned to the criminal investigations division but, that month, she was able to do a temporary in the APU, which is under the CID.

36.   Detective Henderson explained that APU "handle[s] cases that involved children or sex crimes or abductions or rapes."

37.   Detective Henderson was the primary detective assigned to investigate the attempted abduction.   She received that assignment on March 3, 2020, the day after the attempted abduction.

38.   Detective Henderson interviewed T.P. at the McMahon/Ryan Child Advocacy Center at 9:00 AM on March 3, 2020.

39.   Detective Picotte also sat in on the interview, but did not ask any questions.

40.   Ms. Jones was not present for the interview as generally such interviews are private.

41.   Detective Henderson asked her nonleading questions to establish a timeline and get a better description of what happened and put that on paper.

42.   According to Detective Henderson, during the interview, T.P. "stated she was waiting at the bus stop, located at Landon Avenue and [West] Borden Avenue.   The bus [s]top is several blocks away from her residence . . . [T.P.] stated it is not uncommon for her to wait for the bus without her mother.   While at the bus stop [T.P.] had a cell phone on her that she

---

4508362, at *10.

frequently called her mother from on a video chat app called 'Duo.'    T.P. stated while at the bus

stop yesterday morning, she was by herself which is unusual as there is another younger girl that

is typically there was well."

43.    While at the bus stop, T.P. stated she "observed what she described as a light skin

male walking up and down the street."

44.    Detective Henderson understood T.P., who is a Black female, to be describing a

Black male with a light skin tone.[4]

45.    In her deposition, Detective Henderson testified that, when she "hear[s] [a

witness, suspect or victim describe someone as a] light-skin male, based on [her] years of

experience, [the person being described is] typically a light-skinned Black male."[5]

46.    Detective Henderson explained that, in her experience, when she asks for a

---

[4]    Plaintiff admits that Defendant Henderson testified to such an understanding, but
nonetheless denies the correctness of that understanding because that understanding is not
"documented anywhere" or otherwise corroborated by record evidence, and because the
understanding is "arguably is inconsistent with what ordinarily is understood to be a 'light skin
male.'"   (Dkt. No. 60, at ¶ 45.)   However, whether Defendant Henderson's understanding is
correct is not stated in the asserted fact, and Plaintiff may not deny a perceived implication of
fact. *Yetman*, 2015 WL 4508362, at *10.   Furthermore, a genuine dispute of material fact may
not be created merely by challenging the credibility of a witness, or arguing that a fact has not
been conclusively established.   *See McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d
272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely
by "impugning [a witness'] honesty"); *Cantey vs. County of Albany*, 16-CV-0014, 2018
WL2727868, at *2 (N.D.N.Y. June 6, 2018) ("[I]n order to satisfy Defendants' modest threshold
burden on their motion, Defendants need not cite evidence that conclusively establishes their
factual assertion but need only cite evidence that is relevant, i.e., that makes the factual assertion
more probable than it would be without the evidence.").   Because Plaintiff has not cited any
evidence that raises a genuine issue of fact as to what Defendant Henderson's understanding
was, this fact is deemed to be admitted.

[5]    This fact is deemed admitted for the same reasons discussed above in Note 4 of this
Decision and Order.

person's skin tone, the typical response is "white, Hispanic, [or] Black," and if the response is "light-skinned," it is "describing a Black person." Detective Henderson does not "usually get the [light-skinned] description when it's – if they're referring to Hispanic, because they – they usually will just say Hispanic."[6]

47. Sergeant Cazzolli similarly testified at his deposition that he was familiar with the term "light-skinned male," and he understood that descriptor to mean "[a] [B]lack male with a light-skinned complexion."[7]

48. Based on Sergeant Cazzolli's experience, the term "light-skin Hispanics or light-skinned white person" would not fit the descriptor of "light-skinned male."[8]

49. According to Detective Henderson's report, T.P. further informed Detective Henderson that the male was "wearing a red jacket, jeans and had facial hair consisting of a moustache." When asked about how old the male was, T.P. stated that he appeared "younger than her mother," who was 36 at the relevant time.

50. Also according to Detective Henderson's report, "T.P. stated that the male at some point crossed the street and displayed what she believed to be some sort of weapon. [T.P.] did not know what the weapon was, only remembered it to be black in color. The male displayed it and told [T.P.] she needed to come with him or something bad would happen. [T.P.] stated she told the male no and he stated he would give her money. [T.P.] stated she repeatedly told him no and he grabbed onto the hood of her jacket. They started walking down the street, [T.P.]

---

[6]    This fact is deemed admitted for the same reasons discussed above in Note 4.

[7]    This fact is deemed admitted for the same reasons discussed above in Note 4.

[8]    This fact is deemed admitted for the same reasons discussed above in Note 4.

11

stated she was screaming and crying.   [T.P.] pulled her phone out of her pocket while walking and phoned her mother on the Duo app.   [T.P.] stated she did not know what else to do and ended up urinating on herself from the encounter.   The male released his grip from her jacket after he observed the live phone call.   [T.P.] stated the male kept walking and she ran home."

51.     T.P. did not remember seeing anyone else in the area at the time this incident occurred.

52.     T.P. was also shown a photographic array of six individuals, including Vnek.

53.     The COPS Camera footage, and consequently the attempt to identify bulletin, did not contain high-quality photographs of the suspect, and, accordingly, in that footage and bulletin, the suspect appeared Caucasian or white.

54.     T.P. did not recognize anyone in the photo array.

55.     Detective Henderson then conducted a canvass of the area surrounding the Incident Location in search of exterior residential cameras.

56.     Detective Henderson explained that she walked one block north on Landon Avenue to McLennan Avenue, and "believe[s]" she walked a block in either direction–meaning east and west–on McLennan Avenue.

57.     She "also went [in] the other direction and canvassed [s]outh on Landon [Avenue] and then went east and west on West Beard [Avenue], a block each way."

58.     The result of Detective Henderson's canvass for exterior residential cameras involved the following: (1) "416 [West] Beard Avenue, spoke with male home owner who stated his exterior cameras only covered his yard and did not capture the suspect"; (2) "236 McClennan [Avenue]-cameras not functioning"; (3) "233 McClennan [Avenue]--a business card was left for

12

follow up"; and (4) "209 [West] Beard [Avenue]--no answer."

59.    SPD Officer Mary Ellen Gossin reviewed the COPS Camera footage and was able

to follow the suspect on several cameras.

60.    As reported by Detective Henderson, Officer Gossin observed the suspect on the

COPS Camera

> Leaving 213 [West] Colvin Street at 07:49:14 and return[ing] at 09:13:14.
> His route on the cameras start[s] at 08:13:58 at [South] State Street and
> [West] Beard [Avenue].   He heads [s]outh on [South] State Street and
> then [w]est on [West] Colvin Street through [South] Salina Street.   Then
> [s]outh on Cannon Street or Webster [Avenue] to [West] Brighton
> [Avenue], he went [w]est on [West] Brighton to Hope [Avenue] and
> [n]orth on Hope [Avenue] towards [West] Colvin Street.   He is off the
> camera at 08:39:26 when he heads towards Colvin [Street].   He is again
> on cameras at [West] Colvin Street and Midland [Avenue] at 08:46:24,
> headed towards the incident location.

61.    As noted above, the suspect had also previously been observed by an SPD officer

on a COPS Camera "in the area of Kirk [P]ark after the incident, at approximately 0901hrs."

62.    The following day, March 4, 2020, Detective Henderson reviewed video footage

from 1434 Midland Avenue, IBB Mini Mart.

63.    The following images are stills from that footage:





64.      A still image and video clip was submitted to the Onondaga County Crime

Analysis ("OCAC") center.

65.      An updated attempt to identify bulletin was issued based on the IBB Camera

footage.

66.      The updated bulletin described the suspect as "Light skinned male, 20s."

67.      The individual depicted in the IBB Camera footage is wearing a red hooded coat,

blue jeans, has a moustache, and appears to be a light-skinned Black male.

14

68.     The red hooded coat, blue jeans, moustache, and skin tone are consistent with the suspect's description given by Ms. Jones to 911 on March 2, 2020, by T.P. to the responding officers on March 2, 2020, and by Detective Henderson on March 3, 2020.[9]

69.     Plaintiff testified during his deposition that he is the individual depicted in the IBB Camera photographs.

70.     Plaintiff was 31 years old in March 2020.

71.     Plaintiff's age is therefore consistent with T.P.'s description at the McMahon/Ryan Child Advocacy Center on March 3, 2020, of the suspect appearing "younger than her mother" (although it was not consistent with T.P.'s description at home on March 2, 2020, of the suspect appearing "in his teens or twenties").

72.     A different individual (who is referred below as the "unknown individual") was also observed on the COPS Camera footage wearing a red jacket.

73.     That unknown individual, depicted below, was observed near the IBB Mini Mart at 8:42 AM.

---

[9]     Plaintiff admits that some of this description is consistent, but denies that it is completely consistent "given that T.P. reported that the man had [a] hood on and that she really could not see his face."   (Dkt. No. 60, at ¶ 72.)   However, the asserted fact does not state that the description is "completely" consistent, or that T.P. could see the suspect's entire face.   As a result, Plaintiff is denying a fact that was never asserted.   *Yetman*, 2015 WL 4508362, at *10.   In any event, T.P. stated that, because of the hood worn by the man, she "really could not see his face." Indeed, there is nothing inconsistent about T.P. seeing the moustache and skin tone of a man with a hood on.   For each of these alternative reasons, this fact is deemed to be admitted.



74.     Detective Henderson explained that "[o]ther than a red jacket . . . none of the clothing fit the description."

75.     The unknown individual's red jacket did not have a hood and he was wearing tan slacks.

76.     T.P. stated that the suspect had a red hood and was wearing jeans.

77.     Detective Henderson also explained that the unknown individual "was only seen walking south on Midland Avenue."

78.     In other words, Detective Henderson, despite reviewing all relevant COPS Camera footage, never again viewed the unknown individual on any other COPS Cameras.[10]

---

[10]     Plaintiff denies this asserted fact, but his citation to Detective Henderson's deposition testimony that the investigative steps she took in the case were reflected in her reports (which, Plaintiff argues, do not expressly state that this unknown individual was not seen again in any COPS Cameras) does not in any way contradict Detective Henderson's deposition testimony that the unknown individual was "only" seen (in COPS Cameras) walking south on Midland Avenue. (Dkt. No. 60, at ¶ 82; Dkt. No. 50, Attach. 9, at 48-49; Dkt. No. 50, Attach 46, at 160.)   Setting

79.    Travelling south on Midland Avenue from the IBB Mini Mart at 8:42 AM would be walking away from the Incident Location approximately 15-to-20 minutes before the attempted abduction.

80.    Detective Henderson did not observe the unknown individual on COPS Camera footage near the Incident Location.

81.    Accordingly, the unknown individual was not identified as a possible suspect.

82.    On March 5, 2020, based on the COPS Camera footage depicting the suspect entering and exiting 213 West Colvin Street, APU Detective Picotte conducted a CNY Leads search for the resident of that address.

83.    Detective Picotte learned that Erica Williams was a resident of 213 West Colvin.

84.    Detective Picotte then conducted a Facebook search and located Erica Williams, and one of Erica's photos depicted on Facebook was a male resembling the description of the suspect with the Facebook name of "Keenan Iz'Really One'ovaKind."

85.    Detective Picotte then conducted a LIVESCAN search for all persons with the name Keenan.   Upon reviewing all individuals with the name of Keenan, Detective Picotte found that a male by the name of Keenan Pulley resembled the individual with the Facebook name "Keenan Iz'Really One'OvaKind."

86.    Detective Picotte prepared a photographic array containing six images, including one of Keenan Pulley.

87.    Detective Henderson and Detective Picotte presented the photographic array to

_____

aside the lack of probative value of the absence of this fact from her reports, when pressed by Plaintiff's counsel about the issue in her deposition, Detective Henderson explained "there were no other cameras that captured this individual near the incident location."   (Dkt. No. 50, Attach. 10, at 109.)

T.P. at her school.

88.    As stated in a CNYLEADS Narrative Supplement, "[a]fter [T.P.] viewed all six images, [T.P.] held up her hand with four fingers.    [Detective Henderson] asked [T.P.] how she picked number four and she responded that she was not sure.    [T.P.] stated she only knew the suspect did not look like person 1, 2, 3, or 6."

89.    Sergeant Cazzolli, Detective Henderson, and Detective Picotte knocked on the front door of 213 West Colvin at approximately 9:50 AM on March 6, 2020.

90.    The purpose of the visit was to get an identification on the male that was at the residence.

91.    Plaintiff answered the door and stated his name was Darnell Williams.

92.    Plaintiff stated he was staying with his sister, Erica Williams, at 213 West Colvin.

93.    Detective Henderson identified Plaintiff as the same individual on the IBB Mini Mart cameras and COPS Camera footage "entering and exiting 213 West Colvin Street."

94.    In particular, Detective Henderson "recognized the facial hair, which included a moustache and hair on his chin."

95.    Detective Picotte similarly noted that the man who answered the door (i.e., Plaintiff) in his opinion "resembled the suspect from the attempted abduction."

96.    Detective Henderson spoke with Plaintiff for approximately several minutes.

97.    Detective Henderson confirmed Plaintiff's identity through a law enforcement program, CHAIRS 2.

98.    Detective Henderson determined that Plaintiff had an active bench warrant for Menacing in the Second Degree.

99.    An active bench warrant meant that any encounter with a person would be arrested under warrant.

100.    The basis for the bench warrant was an incident from December 2018 in which Plaintiff's sister claimed he assaulted her and threatened her with a gun.

101.    The bench warrant was issued by City Court Judge Theodore H. Limpert on February 26, 2019, signed February 27, 2019, and directed the following: "YOU ARE, HEREBY, COMMANDED FORTHWITH TO ARREST THE ABOVE-NAMED DEFENDANT AND BRING HIM/HER BEFORE THIS COURT."

102.    After speaking with Plaintiff at 213 West Colvin, Detective Henderson and Detective Picotte returned to the McMahon/Ryan Center.

103.    Detective Picotte created a six-person photo array containing an image of Plaintiff.

104.    Detective Henderson and Detective Picotte met with T.P. at her school and showed her the photo array.

105.    T.P. did not recognize anyone in the photos to be a suspect.

106.    Detective Henderson then took a statement from T.P.

107.    According to Detective Henderson, she "asked [T.P.] nonleading questions . . . to establish a timeline and a better description of what happened and put that on paper," such as "[t]hen what happened."

108.    T.P.'s statement concerning the attempted abduction at that time is as follows:

I am giving this statement to Detective Henderson of the Syracuse Police Department regarding an incident that occurred Monday, March 2nd at 9:00 am.

19

I left my house at about 8:40 am.   I walked to the bus stop at the corner.   The street is Landon [Avenue] at [West] Borden [Avenue].   When I first get [sic] to the bus stop I called my mom to let her know I got there.   I was standing at the bus stop waiting.   I then saw a light skinned male that walked by across the street.   He was wearing jeans, a red jacket with the hood up.   The man crossed the street and came over to me.   The male told me to come over to him.   I had to go potty so I tried to let him let me just go home.   He wouldn't let me.   The man pulled out something halfway and asked me if I see [sic] it.   I told him yes.   He told me if I didn't go with him something bad was going to happen.   The object came from his pocket, it was curved at the bottom and I saw tiny dots on it.   I had my phone in my hand and it was already open for me to call my mom.   He wasn't really focused on me, so I called my mom on the Facetime app.   The man had offered me money.   I still said no.   My mom heard me on the phone crying and screaming.   My mom was trying to ask me questions of what was going on.   The man must of [sic] heard my mom on the phone.   The man was pulling me down the sidewalk by the hood of my jacket.   While I was screaming he yelled at me to shut up.   He made me cross the street and walk straight.   The man must of [sic] realized I was Facetiming my mom and he let go of my jacket.   I turned and ran home.   I told my mom what happened when I got home.   I don't know what street the man was on but he turned after we were walking straight.

109.    T.P.'s first-name signature appears at the bottom of pages one and two of her statement.

110.    After taking T.P.'s statement, Detective Henderson showed her four images from the attempt to identify bulletin that was issued March 5, 2020.   The images were viewed by T.P. and she stated that she believed the images were the suspect.

111.    Those four photographs are shown below:



112.    No writing from the attempt to identify bulletin was shown to T.P., only the

photographs.[11]

113.    Detective Picotte testified that he "believe[d] Detective Henderson did a

confirmatory with [T.P.]."[12]

---

[11]    Plaintiff denies this fact, stating that Detective Henderson testified at her deposition that anything she did involving the case was reflected in her report, and that Henderson's report "does not state that the pictures were shown to T.P. separate and apart from the identify bulletin and the writing on the document."   (Dkt. No. 60, at ¶ 117.)   For the sake of brevity, the Court will not linger on the lack of probative value of the absence of a "separate and apart" statement from Henderson's report (even in light of Henderson's deposition testimony regard the comprehensiveness of her report).   More important is the fact that the report to which Plaintiff cites expressly states "[T.P.] was *then* shown four images *from* the attempt to identify bulletin that was issued 05Mar20.   The images were viewed by [T.P.] and she stated that she believed the images were the suspect."   (Dkt. No. 50, Attach. 11, at 3 [emphasis added].)   This report therefore sufficiently states that T.P. was separately shown the images from the bulletin; and it never states that T.P. was shown the bulletin itself.   Indeed, Detective Henderson's own deposition confirms that she showed T.P. only the images, not "the entirety of the bulletin." (Dkt. No. 50, Attach. 10, at 71-72.)   Because there is no basis to sustain Plaintiff's denial, this fact is deemed to be admitted.

[12]    Plaintiff denies this fact, arguing that this was not a "confirmatory" because (1) the images included Plaintiff's face despite the fact T.P. did not know Plaintiff (and had never seen his face), and (2) Defendant Henderson had previously shown T.P. successive photos of Plaintiff in a photo identification procedure that a state court judge later found to be not "merely

114.    A "confirmatory" does not give one the identification of a person.[13]

115.    The purpose of showing T.P. a photograph of "the suspect on camera in the area at the time of the incident" – meaning a "confirmatory" – is to "confirm with the victim that that is the person she's talking about that committed this act against her."[14]

116.    A victim's performance of a "confirmatory". is "based on the victim remembering clothing items, basic, you know, identification things of that person."[15]

117.    In Detective Picotte's opinion, showing a victim a photo array followed by a "confirmatory" is not unduly suggestive because "it's for the investigation of trying to make sure that we are looking for a particular person, that that's the right person we're looking for."[16]

118.    At approximately the same time Detective Henderson was taking a statement

---

confirmatory," but "highly suggestive and impermissible."  (Dkt. No. 60, at ¶ 118.)  First, the fact that the photographs showed Plaintiff's face despite the fact T.P. had not seen his face does not suggest that the identification process was not confirmatory, because they also clearly show his jacket, pants, facial hair, and skin tone, which were the relevant traits T.P. noted during the attempted abduction.   Second, the fact that a state court judge later ruled that the photo identification procedure was not "merely confirmatory" does not controvert the above-stated fact, which has been recast as an express "belie[f]" of Detective Picotte (in conformity with its supporting record evidence).   The Court therefore finds the above-stated fact to be admitted.

[13]    Plaintiff denies this asserted fact, citing as support his response to a fact that he admitted. (Dkt. No. 60, at ¶ 119 [citing his "response to ¶ 114"].)   Even assuming that Plaintiff intended to refer to his response to the preceding paragraph, this fact is deemed to be admitted for the reasons discussed above in Note 12 of this Decision and Order, as well as the fact that the previous denial is not directly responsive to the asserted fact.

[14]    This fact is deemed to be admitted for the same reasons discussed above in Note 12 of this Decision and Order.

[15]    This fact is deemed to be admitted for the same reasons discussed above in Note 12.

[16]    This fact is deemed to be admitted for the same reasons discussed above in Note 12. The Court has altered the asserted fact to make clear that it represents Detective Picotte's opinion.

from T.P., Detective Picotte was taking a statement from T.P.'s mother, Ms. Jones.

119.    Ms. Jones' signed statement concerning the attempted abduction was as follows:

> On Monday, March 2nd, 2020 at approximately 8:50 AM my daughter [T.P.] left our house at [redacted] to go to the bus stop.   She waits for the bus at the intersection of [West] Borden [Avenue] and Landon Avenue.   [T.P.] called me around 8:55 am to let me know that she was at the bus stop and that nobody else was there.   [T.P.] then called me back via a video chat, the Duo App, at approximately 9:00 am.   At that time I noticed [T.P.] was crying hysterically and was being pulled by someone.   [T.P.] was crying and saying "No, I don't want to go with you."   At that time I noticed someone['s] arm, wearing a red colored coat.   That's person['s] arm was behind [T.P.]'s back and was pulling [T.P.].
>       I then frantically ran through my house to get clothes on but eventually just ran out the door with my rob[e] on.   While I was doing this I had my phone in my hand and could hear [T.P.] crying the whole time but I wasn't watching the phone.   As I ran out of my house I noticed [T.P.] running towards the house on [West] Beard [Avenue], the 200 block of [West] Beard [Avenue].   I then got [T.P.] into the house and I got into my car and went looking for someone with a red coat on but didn't find anyone.
>       I then went back to the house and put [T.P.] in the car.   I told her to show me where the guy was.   [T.P.] was standing on the southwest corner of [West] Borden [Avenue] [and] Landon [Avenue] when she said he was walking from the northeast side of [West] Borden [Avenue] [and] Landon Avenue.   [T.P. told] me he was light skinned, black moustache, and was wearing a red colored coat.   [T.P.] said to me that the guy pulled her across the street and up the block a little ways.   I then asked [T.P.] how he let her use the phone and [T.P.] told me he wasn't looking and [her] phone was already unlocked so [she] just called.   I then dialed 911 to call the [police] while we were still in the car.

120.    Ms. Jones' signature appears at the bottom of pages one and two of her statement.

121.    At approximately the same time, or shortly thereafter, APU Detective Shannon drafted a Search Warrant Application for 213 West Colvin.

122.    Detective Shannon's sworn affidavit referenced T.P.'s description of the attempted abductor as "a light skinned male, approximately in his early 20's, wearing a red colored hoodie, blue jeans, and had a moustache."   She further stated that a person matching that

description was seen on COPS Cameras entering 213 West Colvin after the attempted abduction, and that detectives later positively identified Plaintiff as the individual on the COPS Camera footage when they visited 213 West Colvin.

123.    In addition to the sworn affidavit, Detective Shannon also attached the reports drafted by Officer King and Detective Stuper to the Search Warrant Application.

124.    The Search Warrant Application noted that Plaintiff "ha[d] a confirmed active bench warrant out of the City of Syracuse."

125.    The Search Warrant Application sought the search and seizure of "any handguns, firearms, imitation firearms, knives, or any weapon or item similar in description that is adorned with decorative circles or holes, cell phones, clothing to include a red colored jacket/or hooded sweatshirt, blue jeans, black or dark colored knit hat, two-toned black and gray sneakers with white soles, and any other items indicative of a violation of New York State Penal Law Section(s) 120, 265, and 135."

126.    Judge Rory A. McMahon signed the Search Warrant at 1:30 PM on March 6, 2020.

127.    The Search Warrant authorized the search and seizure of the same items referenced in the Search Warrant application.

128.    Detective Henderson, Sergeant Cazzolli, and Detective Picotte executed the search warrant at 213 West Colvin at approximately 1:30 PM.

129.    Plaintiff's sister, Ms. Williams, answered the door at 213 West Colvin.

130.    Ms. Williams provided "verbal permission" to enter and brought the detectives

"upstairs into the apartment" which "was a second-level apartment."[17]

131.   The detectives then presented the search warrant.

132.   The detectives located Plaintiff in his bedroom listening to music.

133.   Detective Shannon then placed Plaintiff in handcuffs "and escorted him down out to the vehicle."

134.   Plaintiff was arrested pursuant to the active warrant related to the Menacing in the Second Degree charge involving his sister.

135.   Detective Henderson and Detective Picotte were the arresting officers.

136.   Following Plaintiff's arrest, Detective Shannon performed a "cursory sort of pat-down of the outside of his body to find anything on him that would–that could harm [the officer] while he was in custody."

137.   Detective Shannon recovered a folding knife or a pocketknife from Plaintiff's right front pocket during the pat search following Plaintiff's arrest.

138.   Detective Shannon described the folding knife as having a "black handle plastic handle to it perhaps and almost like decorative or ornate type holes designed into the handle of it."

139.   A photograph of the knife retrieved from Plaintiff's right front pocket is reproduced below:

---

[17]   Plaintiff implicitly denies this fact to the extent that Ms. Williams did not give detectives permission to search, but the asserted fact does not state thatMs. Williams gave permission to search.  (Dkt. No. 60, at ¶ 135.)   Because the statement of facts is not for the purpose of disputing implied facts, the asserted fact is deemed to be admitted.



140.    Plaintiff was then transported to APU.

141.    Plaintiff was interviewed by Detective Henderson.

142.    Detective Henderson read Plaintiff his Miranda rights "from a[n] SPD department issued Rights Notification and Waiver form."

143.    During the interview, Plaintiff stated he left 213 West Colvin on the morning of March 2 to buy tobacco products at the IBB Mart.

144.    Plaintiff believed he did not leave 213 West Colvin until after 10:00 AM, which was when his sister would return from work.

145.    Plaintiff believed he was wearing a "red, white and blue Fila outfit."

146.    Plaintiff stated that "the only places [he] went" were to get tobacco products, to buy weed, and home.

147.    Detective Henderson asked whether Plaintiff's "gold teeth" were real during the interview.   Plaintiff responded with "no."

148.    Plaintiff stated he went home after he obtained his tobacco products and weed.

149.    Plaintiff then asked to speak to a lawyer and the interview ended.

150.    The interview lasted approximately 20 minutes.   Plaintiff made many statements during the interview reflecting his tone, inflection, and accent.

151.    When executing the search warrant, SPD officers seized several items from

Plaintiff's bedroom, including the clothing items depicted in the COPS Camera footage and the clothing Plaintiff admitted wearing on March 2, 2020, namely, a red jacket, black knit hat, men's sneakers, and a man's denim jeans.

152.    Photographs of the red jacket are below:

 

153.    Plaintiff was arrested for attempted kidnapping in the second degree, menacing in the second degree, criminal possession of a weapon in the fourth degree, and endangering the welfare of a child.

154.    Detective Henderson and Detective Picotte were the arresting officers.

155.    On March 9, 2020, Detective Henderson showed T.P. the black knife retrieved from Plaintiff's right front pocket.

156.    T.P. identified the knife as the object observed during the attempted abduction.

157.    T.P. provided Detective Henderson with the following sworn statement concerning her confirmatory identification of Plaintiff from the previous Friday as well as the knife, in relevant part:

>            While speaking with [Detective] Henderson at my school Friday,
> she showed me four pictures from a bulletin.   I looked at the pictures and

said I think that is him, the man who tried to take me.   [Detective] Henderson asked me how I knew and I told her because of his red jacket and jeans.   The man was also light skinned and I remembered that too.

I had also told her about the weapon the man pulled out and threatened me with.   He pulled out an object that was black in color and curved at the bottom.   It also had tiny holes in it.   [Detective] Henderson showed me an object and I told her that was the same one I saw from Monday.   [Detective] Henderson told me it was a folding knife.

158.    T.P.'s first-name signature appears at the bottom of the statement.

## Grand Jury Proceedings and Indictment

159.    Grand Jury proceedings were held on March 12, 2020.

160.    T.P., Detective Henderson, Sergeant Cazzolli, and Detective Shannon testified.

### *T.P.'s Testimony*

161.    T.P. testified "about the last time [she] took the bus to school."

162.    T.P. explained that while she was waiting for the bus, she saw a man across the street.

163.    According to T.P., the man was wearing a red jacket with a hood, jeans, and sneakers.

164.    T.P. described the man as "[l]ight-skinned."

165.    When asked whether "light-skinned" meant "light skinned black man or . . . light white man," T.P. responded with "[l]ight-skinned black."

166.    T.P. also believed the man had facial hair.

167.    T.P. testified that the man "asked [her] to go with him."

168.    T.P. responded with "[n]o" and said she "had to go to the bathroom."

169.    According to T.P., the man "pulled [out] a weapon" about "halfway" from "[h]is

pocket."

170.    She described the weapon was "black and curved at the bottom and it had dots."

171.    The man "asked [her] did [she] see it" and T.P. responded with "[y]es."

172.    T.P. testified that the man then said "if [she] didn't go with him something would happen."

173.    T.P. was "[s]cared" and "[p]eed on" herself.

174.    According to T.P., the man "made [her] walk with him" by "grabb[ing] [her] hood and just started walking."

175.    T.P. was able to "Facetime" her mother by "press[ing] the home button."

176.    The man then "let [her] go."

177.    T.P. testified that she "was screaming."

178.    T.P. stated she "ran home" and the man continued walking.

179.    T.P. did not know where the man was walking.

180.    T.P. did not know the man.

181.    When she got home, T.P. "told [her] mom and sister what happened" and her mom called the police.

182.    T.P. was not asked the age of the attempted abductor nor did T.P. independently offer his perceived age.

*Detective Henderson's Testimony*

183.    Detective Henderson testified that T.P. described the attempted abductor as "somebody who was younger than her mom.   Her mom, she said, was 36 so the male was younger than her mom, appeared to be light-skinned, light-skinned black.   She specifically said

29

he had a red jacket on and blue jeans."

184.    Detective Henderson's testimony concerning T.P.'s description of the attempted abductor was not offered for the truth of the matter asserted, but rather to explain to the jury what she did next.

185.    Detective Henderson explained she reviewed the COPS Camera footage and saw "a person matching the description that left a residence on West Colvin.   And we can track him kind of going around in a circuit of the area where different cameras ran, and then he returned back to the same residence at 9:13 in the morning."

186.    Detective Henderson believed the attempted abduction "occurred right around 9 in the morning."

187.    Detective Henderson explained that she obtained footage from the IBB Mini Mart and created a bulletin to identify the COPS Camera suspect.

188.    Detective Henderson visited 213 West Colvin and "immediately recognized" Plaintiff as the COPS Camera suspect.

189.    The detective obtained a search warrant and returned to 213 West Colvin to execute it on March 6, 2020.

190.    Detective Henderson interviewed Plaintiff rather than participate in the search.

*Sergeant Cazzolli's Testimony*

191.    Sergeant Cazzolli explained the items recovered from 213 West Colvin when executing the search warrant, including "a red zippered jacket-coat with a hood on it," blue jeans, and sneakers.

*Detective Shannon's Testimony*

192.    Detective Shannon explained that he applied for and obtained the search warrant.

193.    After Plaintiff was arrested, Detective Shannon "placed him in handcuffs" and "conducted a search of his person, patted him down, [and] seized any weapons on him."

194.    Detective Shannon "felt an object in [Plaintiff's] right front pocket of his pants. [Detective Shannon] removed the object and found that it was a folding knife."

*The Indictment*

195.    The Grand Jury indicted Plaintiff on the following four charges: Attempted Kidnapping in the Second Degree, Menacing in the Second Degree, Endangering the Welfare of a Child, and Criminal Possession of a Weapon in the Fourth Degree.

**Post-Indictment Investigation**

196.    In or around November 2020, Plaintiff wished to gain access to his cellphone, which was in SPD custody.

197.    Plaintiff could not remember the password to his phone.

198.    Plaintiff, through counsel, provided SPD with "multiple potential pass codes, none of those worked."

199.    SPD was unable to access the phone because Plaintiff could not provide the password or passcode.

200.    Sergeant Cazzolli spoke with T.P.'s mother on November 5, 2020.

201.    Sergeant Cazzolli was hoping to determine "the time [T.P.] had called her using Google Duo the morning of [March 2, 2020] and how long the conversation lasted."

202.    Ms. Jones found three Google Duo calls from T.P. on the morning of March 2, 2020.

203.    The first call was at 8:50 AM when T.P. was walking to the bus stop.    That call was 38 second long.    The second call was at 8:53 AM and lasted 10 seconds.

204.    The final call occurred at 8:57 AM and lasted two minutes and 18 seconds.    Ms. Jones believed this was the call T.P. made during the attempted abduction.

205.    At Sergeant Cazzolli's request, Ms. Jones provided him with a screenshot of the call log from her Google Duo app.

206.    The Google Duo app call log is specific only to the minute of the call. Accordingly, T.P. called her mother during the attempted abduction at some point between 8:57:01 and 8:57:59.

207.    At some point after speaking with Ms. Jones, Sergeant Cazzolli and Detective Shannon walked the route from the Incident Location to where the COPS Camera suspect next appeared on the COPS Camera located at the corner of "McLennan and Midland [Avenue] [] crossing over Midland [Avenue] toward Kirk Park" at 8:59:51.

208.    A truncated photograph from the COPS Camera located at McLennan and Midland Avenue at 8:59:51 AM on March 2, 2020, depicting Plaintiff on the left-hand side of the photograph, is reproduced below:



209.    A map depicting the route taken by Sergeant Cazzolli and Defendant Shannon is reproduced below:



210.    The Incident Location is depicted in the above map by a red circle near the corner of Landon Avenue and West Borden Avenue.

211.    Sergeant Cazzolli and Detective Shannon's intended arrival point was diagonal, or northwest, from their starting position.

212.    Sergeant Cazzolli and Detective Shannon travelled "north on Landon [Avenue], on the sidewalks and then west on McLennan Avenue until [they] reach[ed] Midland [Avenue]." Their path is depicted by a red line, and the red oblong circle depicts the entrance to Kirk Park.

213.    According to Sergeant Cazzolli, it took Detective Shannon and him approximately three minutes to walk the route at what they characterized as a "[n]ormal pace" (specifically, "a little under three [miles per hour]").

214.    Sergeant Cazzolli and Detective Shannon used a stopwatch to measure the time.

215.    According to Detective Shannon, based on this measurement, he and Sergeant Cazzolli "determined that it was very plausible that [Plaintiff] could have been in both places," meaning the Incident Location at 8:57 AM when the Google Duo call was placed and 8:59:51 when he appeared on the relevant COPS Camera.[18]

216.    After walking the route, Sergeant Cazzolli felt "even far more strongly that [Plaintiff] was the person at that time committing the crime."[19]

---

[18]    Plaintiff denies this asserted fact, arguing that the detectives could not have covered the relevant distance in three minutes if they were traveling at the speed of just under three miles per hour (which is the approximate speed provided by Sergeant Cazzolli in his testimony).  (Dkt. No. 60, at ¶ 224.)   However, Plaintiff's argument does not contradict the asserted fact, which is merely that Detective Shannon *concluded* that the timeline was plausible.   Whether Plaintiff disagrees with that conclusion is more appropriately considered along with his other substantive arguments related to the merits of the motion.   This asserted fact is therefore deemed to be admitted.

[19]    This fact is deemed to be admitted for the same reasons discussed above in Note 18 of

**Pre-Trial Criminal Proceedings**

217.     On March 9, 2020, the county prosecutor provided discovery materials to Plaintiff's initial criminal defense attorney, Joseph M. Wentland.

218.     The prosecutor disclosed additional discovery materials to Attorney Wentland on March 10, 2020, and April 27, 2020.   Included in that production was a video of Plaintiff's interview with Detective Henderson.

219.     Plaintiff was arraigned on the Indictment in Onondaga County Supreme Court on April 28, 2020.

220.     The prosecutor noted that Plaintiff "ha[d] an open case . . . from 2019 when he was charged with menacing in the second degree.   There was a bench warrant pending on that case when this indictment – incident occurred."

221.     Plaintiff was represented by Attorney Wentland.

222.      Attorney Wentland "concede[d] that [Plaintiff] . . . did have one prior failure to appear" on the 2019 misdemeanor matter.

223.     Based on discussions with his client, Attorney Wentland argued that Plaintiff "misunderstood the directions [from the] arraigning attorney" that the matter would "likely be resolved," which was why Plaintiff "did not return to court."

224.     The judge maintained the previously set bail of $50,000 cash, $100,000 bond.

225.     The prosecutor disclosed additional discovery materials to Attorney Wentland on May 1, 2020.

226.     Included in that production to Attorney Wentland on May 1, 2020, was the COPS

---

this Decision and Order.

Camera footage for the COPS Camera located at the corner of Midland and Colvin.

227.    The footage depicts Plaintiff at the corner of Midland Avenue and McLennan Avenue at approximately 8:59:51.

228.    Also included in the May 1, 2020, production were video recordings from six Body Worn Cameras ("BWC").

229.    One of these recordings captures an early interview with T.P. by the responding SPD officers on March 2, 2020.   This video includes T.P.'s statement (which was later shown to be incorrect) that she called her mother at 9:04.

230.    The prosecutor also disclosed a series of SPD reports and documents, including the reports of Officer King, Detective Stuper, Detective Picotte, and Detective Henderson.

231.    The prosecutor disclosed additional discovery materials to Attorney Wentland on May 19, 2020, June 19, 2020, and June 30, 2020.

232.    An additional bail review occurred on July 7, 2020, and Plaintiff was again represented by Attorney Wentland.

233.    The menacing charge involving Plaintiff's sister was still ongoing at the time.

234.    Attorney Wentland addressed that matter with Plaintiff's sister, and argued that she "no longer desire[d] to pursue the case and wish[ed] all charges to be dropped."

235.    The judge maintained the same bail.

236.    The judge issued a Decision/Order on August 4, 2020, addressing Attorney Wentland's "Motion to Suppress certain physical evidence obtained as a result of the execution of a Search Warrant upon the grounds that the application in support of the warrant did not establish the requisite probable cause for the issuance of such warrant."

237.    The judge denied the motion, holding that the "Search Warrant [wa]s legally sufficient and that any items seized incident to the execution of thereof [we]re admissible upon the trial of this action."

238.    Plaintiff's then-girlfriend, Tajai Scott and/or Plaintiff's sister paid Plaintiff's bond and Plaintiff was released.

239.    Plaintiff was released in the Fall of 2020.

240.    A suppression hearing was held on January 13, 2021, concerning T.P.'s identification of Plaintiff.

241.    Plaintiff was represented by new defense counsel, Attorneys Matthew Dotzler and Brian Tedd.

242.    Plaintiff was present for the hearing.

243.    Prior to the start of the hearing, Plaintiff's attorneys requested that the prosecution secure a judicial subpoena for Plaintiff's phone records.   The prosecutor noted that she "had asked [the attorneys] to speak with [Plaintiff] about a pass code and they provided multiple potential pass code[s], [but] none of those worked."   The prosecutor had "no objection to making that application," but noted that the People "still need a little bit more information from [Plaintiff] with respect to his cell phone provider and things like that."

244.    During the hearing, Detective Henderson testified to the photo array wherein T.P. "held up her hand with four fingers and then we further asked if she identified number four, she said she wasn't sure."

245.    Detective Henderson also testified that T.P. failed to identify Plaintiff in a photo array.

246.    However, T.P. did identify Plaintiff when shown still images from the IBB Mini Mart.

247.    The trial court issued a subsequent suppression decision on March 1, 2021.

248.    The trial court denied the motion to suppress Plaintiff's interview statements. However, the trial court granted the motion to suppress T.P.'s identification of Plaintiff and precluded an in-court identification.

249.    The trial court also held a court conference on March 1, 2021, at which Plaintiff appeared telephonically.

250.    In light of the trial court's suppression of T.P.'s identification, the court reconsidered the validity of the search warrant, despite already having ruled on that issue.

251.    This was because of criminal defense counsel's earlier argument "that if the unduly suggestive identification of the defendant is suppressed, then that search warrant must be re-examined, re-reviewed, and potentially that evidence suppressed."

252.    The trial court re-examined the warrant and the supporting documents, namely Detective Shannon's affidavit, as well as the reports from Officer King and Detective Stuper.

253.    The trial court explained that T.P.'s identification "was not considered by this Court in its initial decision, nor did it form the basis for the finding of probable cause in that search warrant.   Therefore, the Court [stood] by its prior decision regarding the sufficiency of the warrant that was issued, and the motion to suppress any evidence as fruit of the poisonous tree, for lack of a better term, is denied."

254.    The trial court further explained during the conference that his suppression "ruling regarding the suggestiveness of the identification procedure [would] not preclude the

victim from identifying, of course if she's able, at trial either the jacket or the knife that was taken as evidence."

255.    A virtual pre-trial court conference was held on April 2, 2021.

256.    Plaintiff appeared virtually after the prosecutor and his attorneys had left the conference.

257.    The trial court informed Plaintiff that his trial was scheduled for April 26, 2021.

258.    The trial court also warned Plaintiff about not appearing at trial, and Plaintiff responded, as follows:

> THE COURT: . . . And what I want to do is give you [] what we refer to as your Parker warnings.   That means, since you made bail, you have come to court every time I have asked you.   You need to continue to come to court when I request you to come to court.   And as far as a trial goes, you have to be there for jury selection.   You have to be there every single day of the trial.   If you are not there and we don't have a compelling reason, then we would proceed without you.   Do you understand?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you have any questions for me?
>
> THE DEFENDANT: No, sir.

259.    As Attorneys Dotzler and Tedd were not present for the foregoing, the trial court directed Plaintiff to call his attorney when they were "done talking this morning, [and] let him know that you did come on and that I did speak to you and that we have you on for next Friday the 9th at 10:30."

260.    Plaintiff responded with "Okay" and stated that he had no questions for the court.

261.    A subsequent pre-trial conference occurred on April 12, 2021, at which Attorney Tedd appeared on behalf of Plaintiff.

262.    Plaintiff did not appear at the April 12, 2021, court conference.

263.    According to the trial court, "[t]he attorneys tried to get him in but were not successful in getting him."

264.    The court scheduled trial for April 26, 2021.

265.    The trial court scheduled another pre-trial conference for April 15, 2021, because, according to the court, "we got to get [Plaintiff] in here.   He's got to be here in Court to make sure that he's going to be here for our trial."

266.    Plaintiff was represented by Attorneys Dotzler and Tedd at the conference on April 15, 2021.

267.    Plaintiff did not appear at the conference on April 15, 2021.

268.    Attorneys Dotzler and Tedd "advised [the court] they have been attempting to contact their client consistently and constantly since April 12th with no luck."

269.    The trial court had no "other option but to issue a warrant for [Plaintiff's] arrest."

270.    The prosecutor disclosed additional discovery materials to Attorney Dotzler on April 16, 2021.

271.    A pre-trial conference was again held on April 19, 2021.

272.    Plaintiff was represented by Attorneys Dotzler and Tedd at that conference, but did not himself appear.

273.    As told to the court, Plaintiff "apparently believed or at least said to [his girlfriend] that his criminal case here was over with, which has actually been keeping him here locally in Syracuse for the past year, and based on his belief that the case was over with, he has returned to Alabama, . . . which obviously makes it highly unlikely we will have him seated at

the table with us for the jury trial next week."

274.    Plaintiff's previous attorney, Attorney Wentland, made a similar argument during Plaintiff's arraignment related to the 2018/2019 menacing charge.

275.    The trial court disagreed with Attorney Dotzler's contention that Plaintiff reasonably believed his criminal case had concluded.

276.    The court explained that he "advised [Plaintiff] to get in touch with his attorney. He told me he was going to do all of those things and the trial date was April 26, second in order but it was a trial date.   So there is no indication, zero, that he thought the case was over."

277.    A final pre-trial conference occurred on April 22, 2021.   Plaintiff again was represented by Attorneys Dotzler and Tedd, but Plaintiff did not appear.

**Criminal Trial**

278.     Trial commenced on April 26, 2021.   Plaintiff was represented by Attorneys Dotzler and Tedd, but Plaintiff did not appear.

279.    Testimony began on April 27, 2021.

*T.P.'s Testimony*

280.    T.P. testified that she called her mom from the bus stop on March 2, 2020.

281.    While at the bus stop, she observed a man on the other side of the street walking away from her.

282.    The man was wearing a red jacket with a hood, blue or black jeans and sneakers; the hood was on his head.

283.    The man then turned toward her.

284.    T.P. stated that the man's skin was "a light color," meaning "[a] light-skinned

black male."

285.    The man also had a moustache that, according to T.P., wasn't fully there."

286.    The man "asked [her] to come with him."

287.    T.P. said "[n]o . . . because [she] didn't know him."

288.    The man then "showed [her] something in his pocket.   He said if [she] didn't come with him, then something will happen."   The item he showed her was in his front pants pocket.

289.    T.P. was "not sure" what the item looked like, but she felt "[s]cared."

290.    The man told her that "if [she] came with him, then . . . [she] could get like money or some candy."

291.    T.P. had to go to the bathroom while she went to the bus stop that morning.   She wet herself during the interaction "[b]ecause [she] was scared and he wouldn't let [her] leave."

292.    The man "pulled [her] hood and [they] started walking."   T.P. and the man "crossed a street" and they walked "[a]way from [her] house."

293.    T.P. was "screaming" and the man "told [her] to be quiet," but T.P. continued to scream.

294.    T.P. was able to call her mother using the video calling application, Google Duo. The man was still holding her coat when she used the application.   He let go of her coat when "he heard [T.P.'s mother] talk."

295.    T.P. was able to run home, and the man walked away from her house.

296.    T.P.'s mother and sister were at her house and helped her calm down.   T.P. then changed her clothes because she had wet herself.

297.   T.P. was then shown a photograph of the unknown individual caught on the COPS Camera footage.   T.P. testified that the individual depicted was not the man who tried to abduct her.   According to T.P., the man depicted was wearing tan pants whereas the man who tried to abduct her was wearing "either black or light blue" jeans.

298.   T.P. was also shown the pocketknife recovered from Plaintiff's pocket.   T.P. recognized the knife "because it ha[d] the same design on it when he," meaning the man who tried to abduct her, "showed it to [her]."

299.   On cross-examination, T.P. recalled telling police during her initial interview that "the person had light skin" and "might be Puerto Rican."

300.   T.P. was not asked the age of the attempted abductor, nor did T.P. independently offer his perceived age.

*Sergeant Cazzolli's Testimony*

301.   Sergeant Cazzolli testified that he went to 213 Colvin on March 6, 2023, with Detective Picotte and Detective Henderson.

302.   Plaintiff answered the door and identified himself as Darnell Williams.   Sergeant Cazzolli recognized Plaintiff as "the same person from the images of the IBB Market."

303.   Later that day, SPD officers executed a search warrant at 213 West Colvin where they "collected a red jacket, five black knit caps, a belt, a pair of blue jeans, and a pair of sneakers."

304.   Sergeant Cazzolli also testified to the time he believed the incident occurred, which was 8:57 AM based on Ms. Jones' phone log, and that he walked from the West Bordon and Landon Avenue intersection to the McLennan and Midland Avenue intersection in about

three minutes.

*Ms. Jones' Testimony*

305.    Ms. Jones testified that T.P. called her three times that morning from the bus stop using the Duo app.

306.    On the third call, T.P. "was crying and saying I don't want to go."

307.    Through that video call, Ms. Jones could see T.P. "and a little bit of a person behind her."

308.    The person had "a red coat sleeve."

309.    After T.P. ran home, she and Ms. Jones went to look for someone in a red coat but did not locate anyone.

*Detective Shannon*

310.    Detective Shannon testified that he seized a folding knife from Plaintiff's right front pocket on March 6, 2020.

*Detective Henderson's Testimony*

311.    Detective Henderson testified that, during her initial meeting with T.P., T.P. "described the suspect as a light-skinned male, early twenties, younger than her mother, who was thirty-six, wearing a red hooded jacket with the hood up, blue jeans and black-and-white sneakers, also a black winter hat."   T.P. also stated the man had a moustache.

312.     Detective Henderson's testimony concerning T.P.'s description of the attempted abductor was not offered for the truth of the matter asserted, but rather to explain to the jury what she did next.

313.    Plaintiff's criminal defense attorney did not object to this testimony.

44

314.    According to Detective Henderson, an individual matching that description was first viewed on COPS Cameras at "Kirk Park at approximately 9:01 in the morning."

315.    Detective Henderson testified that she reviewed all the relevant COPS Camera footage during her investigation.

316.    During her testimony, Detective Henderson walked the jury through different still images from the COPS Camera footage and the IBB Mini Mart security cameras captured on March 2, 2020.

317.    Of note, at 8:46 AM, Plaintiff is observed on COPS Cameras travelling north on Midland Avenue and then "crossing the yard a little bit, . . . heading toward West Beard [Avenue]."

318.    Plaintiff is next observed "crossing Midland [Avenue]."

319.    The following day, Plaintiff was found not guilty on all counts.

320.    Plaintiff did not attend the trial, and therefore was not present for the verdict. Plaintiff's then-girlfriend told him that he had been acquitted.

**Plaintiff's Post-Trial Testimony**

321.    Plaintiff testified twice in this matter, first during his 50H examination and again during his deposition.

322.    Plaintiff stated that, on the morning of March 2, 2020, he left 213 West Colvin in search of marijuana.

323.    While out that morning, Plaintiff claims that he "got a call from [his] sister, and she told [him] that someone she knew, the girl that she knew, was going to meet [him] at the park to purchase some marijuana. So [he] walked to the Kirk Park to meet the girl with the

weed."

324.    According to Plaintiff, this call occurred as he "was coming out of Ze Mart."

325.    The woman he met with to buy marijuana was named "Peewee" or "Peeski." Plaintiff did not know her legal name.

326.    According to Plaintiff, "by the time [he] got to Kirk Park that's when [he] got the call from Peewee saying to meet her at the street over from Kirk Park because there was cameras in Kirk Park and she didn't want her car to be on camera.   So [he] met her at the street over from Kirk Park and purchased the marijuana."

327.    Plaintiff did not know the street where he met with Peewee.

328.    During his interview with Detective Henderson, Plaintiff did not mention that he spoke with his sister on the phone on March 2, 2020.[20]

329.    During his interview with Detective Henderson, Plaintiff did not mention that he spoke with Peewee on the phone on March 2, 2020.[21]

330.    During his interview with Detective Henderson, Plaintiff did not mention that he obtained marijuana specifically from Peewee near Kirk Park on March 2, 2020.

331.    Plaintiff's sister, Ms. Williams, was also deposed in this action.

332.    Ms. Williams denied informing Plaintiff that he could obtain marijuana from Peewee on March 2, 2020.

---

[20]    Plaintiff admits the asserted fact but denies "any suggestion that Detective Henderson posed any question to Plaintiff that would have elicited an answer that he spoke with his sister." (Dkt. No. 60, at ¶ 344.)   However, the asserted fact does not state that such a question was posed, and Plaintiff may not properly deny a perceived implication of fact.   *Yetman*, 2015 WL 4508362, at *10.

[21]    This fact is deemed to be admitted for the same reasons discussed above in Note 20 of this Decision and Order.

333.    When asked, "who is Peewee," Ms. Williams responded, "Honestly, I don't know who that is.   I've heard the name before, but I don't know the person personally."

334.    Ms. Williams stated that she did not have Peewee's phone number.

335.    During his deposition, Plaintiff was asked to go through screen shots from the COPS Camera and IBB Mini Marts security footage from March 2, 2020.

336.    Plaintiff agreed that he is the individual depicted in each of the photographs.

337.    Plaintiff agreed that one of the photographs depicts him near the area where his sister was staying at approximately 7:49 AM on March 2, 2020.

338.    The photographs show Plaintiff travelling north on the west side of Midland Avenue and crossing to the east side of Midland Avenue, beginning at approximately 8:46 AM and concluding at approximately 8:48 AM.

339.    Plaintiff admitted that he is the individual depicted in the photographs, wearing blue jeans, black-and-white sneakers, and a red North Face jacket.

340.    Plaintiff agreed that, in the final photograph in this series, he is depicted "on a grassy area."

341.    These photographs depict Plaintiff with his red hood "up," meaning covering his head.

342.    These photographs depict Plaintiff walking in a northeasterly direction.

343.    Plaintiff's northeasterly route is in the direction of the Incident Location.

344.    Plaintiff is next seen on COPS Camera footage at the corner of Midland Avenue and McLennan Avenue at approximately 8:59:51 AM.

345.    There is no COPS Camera footage depicting Plaintiff between approximately

8:48:23 AM and 8:59:51 AM.

346.     The corner of Midland Avenue and McLennan Avenue is north of the IBB Mini Mart.

347.     Accordingly, the COPS Camera footage established that Plaintiff continued travelling north after leaving the IBB Mini Mart.

348.     Plaintiff admitted that he is depicted in the various photographs that were presented to him at the deposition.

349.     Plaintiff admitted that photographs presented show the red North Face jacket he was wearing on March 2, 2020.

350.     Plaintiff admitted that a photograph presented depicted the pocketknife he had on him when he was arrested.

351.     Plaintiff stated that he did not "typically carry that pocketknife" and could not recall whether he was "carrying that pocketknife on March 2."

352.     Plaintiff's sister, Ms. Williams, testified that Plaintiff "always" carried a pocketknife.

353.     Plaintiff admitted that he did not attend the trial.

354.     Plaintiff admitted that he was "informed by the court that [he] had to attend all court proceedings" and that it was a "condition of [his] bail that [he] attend all court proceedings."

355.     During his 50H examination, Plaintiff asserted his Fifth Amendment rights and refused to answer questions about his failure to attend the trial.

356.     However, Plaintiff stated during his deposition that he did not attend the trial

because he "was scared."

357.    Plaintiff stayed with his then-girlfriend, Ms. Scott, during the trial.

358.    Ms. Scott attended the trial every day and provided Plaintiff with trial updates.

359.    Ms. Scott was also in contact with Plaintiff's criminal defense counsel.

**D.      Parties' Arguments on Defendants' Motion for Summary Judgment**

**1.      Defendants' Memorandum of Law**

Generally, in their motion for summary judgment, Defendants make five arguments. (Dkt. No. 50, Attach. 59.) First, Defendants argue that Plaintiff's First Claim for false arrest/imprisonment pursuant to New York law must be dismissed because Defendants had probable cause to arrest Plaintiff based on both the factual circumstances related to the claims underlying this action as well as an outstanding arrest warrant for a different crime, and the existence of probable cause is an absolute defense to a claim for false arrest.   (*Id.* at 9-15.)

Second, Defendants argue that Plaintiff's Second Claim for malicious prosecution pursuant to New York law also must be dismissed based on the existence of probable cause for the following reasons: (a) there was probable cause to prosecute Plaintiff under the factual circumstances revealed by the Defendants' investigation; (b) other evidence obtained after the initiation of the prosecution, including the call log provided by Plaintiff's mother that identified a more precise timeline of the attempted abduction, supported probable cause; and (c) the Indictment on the relevant charges itself creates a presumption of probable cause that Plaintiff would be unable to rebut here because there is no evidence that Indictment was obtained through fraud, perjury, suppression of evidence, or other bad faith police conduct.   (*Id.* at 15-18.)

Third, Defendants argue that Plaintiff's Fourth and Sixth Claims for denial of the right to

a fair trial based on falsehoods and withholding exculpatory material, respectively, must be dismissed, because (a) Plaintiff's allegations that any of the identified statements made by the Defendants were false are based solely on Plaintiff's self-serving, uncorroborated assertions, and (b) Plaintiff's allegations that material was withheld from him are baseless in that the evidence shows that all such material was provided both to the prosecutor and to Plaintiff's defense counsel during his criminal case. (*Id.* at 18-25.)

Fourth, Defendants argue that Plaintiff's Third Claim for "improper search and seizure" in violation of 42 U.S.C. § 1983 (which they construe as containing claims for false arrest, malicious prosecution, and an unconstitutional search of Plaintiff's house and person) must be dismissed. (*Id.* at 25-29.) More specifically, Defendants argue that (a) the false arrest and malicious prosecution components of this claim must be dismissed for the same reasons that his state law versions of such claims must be dismissed, namely the existence of probable cause, and (b) the search components of his claim must also be dismissed because the search was conducted pursuant to a valid judicial search warrant supported by probable cause and thus was presumptively reasonable given that Plaintiff cannot show that it was obtained through false statements or material omissions and, indeed, the trial court in Plaintiff's criminal proceedings found that probable cause existed to support that search warrant even though it found T.P.'s identification of Plaintiff in the photo array to be unduly suggestive. (*Id.*)

Fifth, Defendants argue that Plaintiff's Fifth Claim for failure to intervene must be dismissed because, as argued earlier, Plaintiff cannot show that any substantive constitutional violation was committed, or, in the alternative, because there is no evidence to suggest that the other officer Defendants had a reasonable opportunity to intervene in any of the alleged

constitutional violations.   (*Id.* at 29-30.)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff makes

five arguments.   (Dkt. No. 59, Attach. 2.)   First, Plaintiff states that he does not oppose the

portions of Defendants' motion that seek summary judgment on Plaintiff's Sixth Claim regarding

the alleged withholding of exculpatory evidence because he acknowledges that such claim is

barred by his acquittal, and on his state and federal claims for false arrest (i.e., his First Claim

and an aspect of his Third Claim) because he acknowledges that the outstanding arrest warrant

renders him unable to succeed on those claims.   (*Id.* at 8 n.1.)

Second, Plaintiff argues that there is sufficient evidence to raise a dispute of material fact

related to probable cause as to his malicious prosecution claims (i.e., his Second Claim and an

aspect of his Third Claim).   (*Id.* at 9-20.)   More specifically, Plaintiff argues that (a) T.P.'s

description of the suspect was unreliable because that description at various times contained

inconsistencies and Defendants did not appropriately investigate the credibility of any of her

statements or ask Plaintiff questions about whether she noticed certain distinctive features

Plaintiff possesses, such as his accent and his gold teeth, (b) Plaintiff's description was not

corroborated by her mother because Ms. Jones saw only an arm with a red-sleeved jacket, (c)

T.P.'s description of the weapon was also unreliable because she initially said she did not see it

and did not know what it was, (d) the identification procedure with the photo arrays was

improperly suggestive, and (e) Defendants' attempt to show that Plaintiff could have been at the

relevant location at the time of the attempted abduction is based on distorted facts.   (*Id.* at 9-19.)

Plaintiff further argues that the camera footage does not establish probable cause because (a)

51

again, T.P.'s description is unreliable, and (b) that footage does not establish that Plaintiff was at the scene of the attempted abduction at the time T.P. initially told police it occurred, and Defendants' attempts to suggest otherwise in order to procure the Indictment against Plaintiff constituted bad faith that negates the presumption of probable cause created by that Indictment. (*Id.* at 13-14, 19-20.)

Third, Plaintiff argues that summary judgment is not warranted on his Fourth Claim for denial of the right to a fair trial based on fabrication of evidence because the evidence creates at least a genuine dispute of material fact as to whether Defendants Henderson and Picotte fabricated evidence by manipulating T.P. into making a false identification and whether Defendants Cazzolli and Shannon fabricated the walking simulation to establish the timeline to support their theory that Plaintiff was the suspect. (*Id.* at 20-23.)

Fourth, as to his Third Claim related to unlawful search and seizure, Plaintiff argues that there is at least a genuine dispute of material fact as to whether the search warrant was valid because the evidence shows that there were reasons to doubt the information upon which that warrant was based, including the unreliability of Plaintiff's description and identification of Plaintiff. (*Id.* at 23-25.) Plaintiff further argues that he is not estopped from challenging the validity of the search warrant as a result of the ruling by the criminal court because he was not provided with a full and fair opportunity to litigate this issue given that, as a result of his acquittal, he has not had the ability to seek appellate review of the criminal court's findings related to the search warrant. (*Id.* at 24-25.)

Fifth, Plaintiff argues that summary judgment is not appropriate on his failure-to-intervene claim because (a) Defendants' argument that all of his substantive claims must be

dismissed should be rejected for the reasons already discussed, and (b) the evidence is sufficient to raise a genuine dispute of material fact as to whether the various defendant officers would have had an opportunity to intervene in the actions of the Defendants who committed the substantive violations.   (*Id.* at 25-27.)

### 3.    Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiff's opposition, Defendant makes six arguments.   (Dkt. No. 67.)   First, Defendants note that Plaintiff has not opposed the dismissal of his state and federal claims based on the tort of false arrest (i.e., his First Claim and an aspect of his Third Claim). (*Id.* at 5.)

Second, Defendants argue that Plaintiff's claim for malicious prosecution (i.e., his Second Claim and an aspect of his Third Claim) must be dismissed because the undisputed evidence establishes probable cause as a matter of law.   (*Id.* at 5-12.)   More specifically, Defendants argue the following: (a) T.P.'s description of the suspect was not unreliable or inconsistent with itself and the fact that officers did not ask about certain features such as gold teeth or an accent does not render that description unreliable; (b) Ms. Jones' testimony does corroborate T.P.'s description to the extent she also saw that the suspect was wearing a red jacket; (c) Plaintiff's insistence that the attempted abduction occurred at 9:04 AM based on T.P.'s initial statements does not render the COPS Camera footage insufficient to establish probable cause because official reports by T.P. and her mother stated that the incident occurred "at approximately 9:00 am," statements that are consistent with both Plaintiff's initial testimony and later verification from phone call logs showing the relevant call during the attempted abduction took place at 8:57, and also consistent with the footage that shows Plaintiff within a

few blocks of the Incident Location at 9:02 AM; (d) Defendants Cazzolli and Defendant Shannon conducted a simulation that suggested that a fleeing suspect could have reached the point where Plaintiff was seen on the COPS Camera by the time indicated if the attempted abduction did indeed occur at the time indicated by Ms. Jones' call log; (e) the fact that the identification was found to be too suggestive to be admissible at trial does not mean it cannot support the existence of probable cause, and (f) Plaintiff has not shown that he could rebut the presumption of probable cause created by the Indictment because no evidence was concealed from the prosecutor and he has not shown that any actions by the Defendants were taken in bad faith.  (*Id.*)

Third, Defendants argue that Plaintiff's Fourth and Sixth Claims must be dismissed because (a) all evidence was disclosed and Plaintiff has not identified any false statement or fabricated evidence, and (b) he has acknowledged that his claim based on alleged *Brady* violations must be dismissed.  (*Id.* at 12-13.)

Fourth, Defendants argue that Plaintiff's Third Claim based on false arrest and malicious prosecution must be dismissed for the same reasons as the state law versions of those claims as already discussed.  (*Id.* at 13.)

Fifth, Defendants argue that Plaintiff's Third Claim based in an improper search must be dismissed because Plaintiff has not shown that the search warrant was invalid or based upon improper or falsified evidence.  (*Id.* at 14.)

Sixth, Defendants argue that Plaintiff's Fifth Claim must be dismissed if all of the above claims for substantive constitutional violations are dismissed.  (*Id.* at 14.)

## II.    LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[22]   As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."   *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a), (c), (e).[23]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

---

[22]   As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."   *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[23]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.).. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[24] Stated another way, when a non-movant fails to oppose a legal argument

---

[24] *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

asserted by a movant, the movant may succeed on the argument by showing that the argument

possess facial merit, which has appropriately been characterized as a "modest" burden.  *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested

therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL

2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

### A.    Whether Plaintiff's Claims for False Arrest (i.e., His First Claim and Part of His Third Claim) and for Withholding Exculpatory Evidence (i.e., His Sixth Claim) Must Be Dismissed

The Court answers this question in the affirmative.    Plaintiff states that he does not

oppose dismissal of these claims, thus lightening Defendants' burden with regard to them to one

of facial merit.   (Dkt. No. 59, Attach. 2, at 8 n.1.)[25]   Because it is undisputed that Plaintiff was

---

[25]     In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   See N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).   Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument).   *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made–i.e., referencing some claims or defenses but not others–a distinction between pro se and counseled responses is appropriate. In the case of a pro se, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer

arrested on March 6, 2020, pursuant to the active arrest warrant from 2019, and that his arrest ultimately led to the charges underlying this litigation, the Court finds that there is at least facial merit to Defendants' argument there is no genuine dispute of material fact that the arrest was supported by probable cause. *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("Following *Devenpeck*, we conclude here that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest."); *see also Briggs v. Casey*, 22-CV-1221, 2024 WL 1913038, at *3 (N.D.N.Y. May 1, 2024) (Stewart, M.J.) ("The issuance of an arrest warrant alone, 'which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause.'") (quoting *Washington v. Napolitano*, 29 F.4th 93, 105 [2d Cir. 2022]).

Similarly, because it is undisputed that Plaintiff was acquitted, and because Plaintiff has not pointed to any exculpatory evidence that could have been withheld, the Court finds that there is at least facial merit to Defendants' argument that Plaintiff's claim of withholding exculpatory evidence must be dismissed. *See Cannistraci v. Kirsopp*, 10-CV-0980, 2012 WL 1801733, at *17 (N.D.N.Y. 2012) (D'Agostino, J.) ("When a criminal defendant is acquitted notwithstanding an alleged *Brady* violation, the criminal defendant has not suffered prejudice, and *Brady* has not been implicated.")

For all of these reasons, Plaintiff's claims of false arrest and withholding exculpatory

---

from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

evidence are dismissed.

**B.    Whether Plaintiff's Claims for Malicious Prosecution (i.e., His Second Claim and Part of His Third Claim) Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra* Part I.D. 1 & 3.   To those reasons, the Court adds the following points.

"To prove a malicious prosecution claim, a plaintiff must demonstrate '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.'"   *Georgia v. Davenport*, 21-CV-0484, 2024 WL 1074970, at *9 (N.D.N.Y. Mar. 12, 2024) (quoting *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 [2d Cir. 1999]).   For a federal claim under Section 1983, a plaintiff must also show "'a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'"   *Georgia*, 2024 WL 1074970, at *9 (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 216 [2d Cir. 2000]).

"'[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York,' . . . and 'indictment by a grand jury creates a presumption of probable cause'" that can be rebutted "only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 [2d Cir. 2003]).

Further, in contrast to a claim for false arrest, a claim for malicious prosecution is assessed on a charge-by-charge basis, meaning that, in order to show that probable cause merits

the dismissal of such claims, the defendant must show that there was probable cause for all individual charges brought in the prosecution; if one charge is found to be not supported by probable cause, the cause of action on that charge may continue, even if other charges are found to be supported by probable cause.  *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 563-64 (2024).

Here, the charges underlying Plaintiff's prosecution–attempted kidnapping in the second degree,[26] menacing in the second degree,[27] endangering the welfare of a child,[28] and criminal possession of a weapon in the fourth degree[29]–all stem from the same incident.   Having carefully considered the elements and requirements of each of the four charges, the Court finds that the undisputed evidence presented shows that probable cause existed for all of those individual charges, although, for the sake of brevity, the discussion related to probable cause and the evidence has been consolidated into a single assessment.

Plaintiff makes many arguments regarding why he believes that there is at least a genuine

---

[26]    Attempted Kidnapping in the Second Degree (N.Y. Pen. L. §§ 110.00 and 135.20) involves the attempted abduction of another person.

[27]    Menacing in the Second Degree (N.Y. Pen. L. 120.14(1)) involves "intentionally plac[ing] or attempt[ing] to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm."

[28]    Endangering the Welfare of a Child (N.Y. Pen. L § 260.10(1)) involves "knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health."

[29]    Criminal Possession of a Weapon in the Fourth Degree (N.Y. Pen. L. § 265.01(2)) involves "possess[ing] any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another."

dispute of material fact in this case as to the issue of probable cause; but, because there was an Indictment rendered by the Grand Jury in this case, such arguments do not become relevant until and unless Plaintiff has shown that there is evidence from which a reasonable factfinder could conclude that the presumption of probable cause created by that Indictment has been rebutted. As discussed above, such presumption cannot be rebutted merely by pointing to evidence that might undermine probable cause, but rather "*only* 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Manganiello*, 612 F.3d at 161-62 (emphasis added).

Here, Plaintiff does not argue that Defendants engaged in fraud, perjury, or evidence suppression when presenting the matter to the Grand jury.   Instead, Plaintiff argues that the Defendants conducted their pre-Indictment investigation in bad faith, because (a) they ignored the fact that T.P. had stated during the initial questioning by officers that the incident had occurred at 9:04 AM, and failed to further investigate the actual time of the incident, (b) they "hid" the evidence of T.P.'s statement on this matter, and (c) Defendant Henderson testified to the Grand Jury regarding the improperly suggestive photo array.   (Dkt. No. 59, Attach. 2, at 19-20.)   As to the timing of the attempted abduction, he argues that, had the Defendants conducted a proper investigation, it would have been clear to them that Plaintiff could not be the suspect because COPS Camera footage showed him in a different location away from the Incident Location around the relevant time.

However, the evidence regarding timing that was available before the Grand Jury proceedings included not only T.P.'s statement highlighted by Plaintiff, but also Ms. Jones' statement during the 911 phone call placed at 9:10 AM in which she stated that the attempted

abduction occurred 15 or 20 minutes before that call (which would place the incident at approximately 8:50 or 8:55 AM), evidence which squarely supports Defendants' theory of the timeline based on the COPS Camera footage.    Therefore, to the extent Plaintiff argues that Defendants acted in bad faith by "hiding" T.P.'s statement from the Grand Jury, it is notable that they also did not mention this contrary evidence regarding timing in their testimony that would provide an independent basis for a finding of probable cause.    Indeed, Defendant Henderson testified to the Grand Jury that she believed the incident occurred "right around 9 in the morning," which essentially splits the difference T.P.'s statement that it she called her mom at 9:04 AM and the statement of Plaintiff's mother that the incident occurred around 8:50 or 8:55 AM.    Given the evidence available to Defendants at the time of the Grand Jury proceedings, estimating the time of the incident as approximately 9:00 AM was not fraudulent, inaccurate, or indicative of bad faith.

Moreover, the conflicting evidence regarding time is not a material question of fact that must be left to a jury to resolve because resolution of Plaintiff's claim does not require a finding as to when the attempted abduction *actually* occurred.    Rather, the question is whether Defendants acted in bad faith or suppressed evidence in order to procure the Indictment.    The fact that the Grand Jury was not presented with testimony regarding all of the available evidence about the timing of the incident and about when Plaintiff was seen on the COPS Camera footage in order to compare and make a factual determination about whether he was at the relevant location at the relevant time does not render Defendants' presentation of evidence improper in any sense that would rebut the presumption of probable cause created by the Indictment because Plaintiff has not shown that failure to present such evidence was improper, or in any way in bad

faith, or in a manner amounting to suppression of evidence.

Further, to the extent Plaintiff argues that Defendants acted in bad faith by failing to conduct a more extensive investigation into the timing of the incident before seeking to bring charges, that argument also must be rejected. In particular, Plaintiff has not cited any evidence that would indicate that further investigation sooner would have resulted in the Grand Jury not issuing the Indictment. The call log from Ms. Jones' phone that was obtained through further investigation in 2021 shows that the relevant third call that occurred while T.P. was being abducted was received by Ms. Jones' phone at 8:57 AM. (Dkt. No. 50, Attach. 3; Dkt. No. 50, Attach. 54.) The evidence obtained through further investigation into the timing of the incident therefore contradicts T.P.'s initial statement upon which Plaintiff bases his argument that he could not have been in the relevant location at the time of the attempted abduction, and indeed bolsters Defendants' belief that Plaintiff was the suspect in conjunction with the timing of Plaintiff's appearances on the various COPS Cameras. As a result, Plaintiff's argument that Defendants seemingly failed to follow proper police procedure by not investigating the actual time of the incident sooner cannot serve as a basis for rebutting the presumption of probable cause.

Plaintiff also argues that Defendant Henderson acted in bad faith by presenting evidence to the Grand Jury of the positive identification from the improperly suggestive photo array. Setting aside the fact that the Court need not accept Plaintiff's implied argument that the photo identification was unduly suggestive given that the state trial court's finding to that effect was not a final judgment and therefore is not entitled to collateral estoppel (as will be discussed in the next section related to Plaintiff's claim for an unconstitutional search), the testimony regarding

that identification was only one piece of evidence presented to the Grand Jury.   The testimony of T.P., Defendant Henderson, Defendant Cazzolli, and Defendant Shannon together indicated that the clothing, facial hair, and skin tone of the person described by T.P. matched the individual seen in the COPS Camera footage, the individual officers saw when they visited Plaintiff's address, and the items of clothing found at that address.   (*See generally* Dkt. No. 50, Attach. 30.)   Also notable is the fact that Defendant Henderson's Grand Jury testimony specifically states that (a) T.P. was first unable to identify any suspect from an initial photo array, and (b) when shown pictures of the individual from the COPS Camera footage that was used on the law enforcement bulletin, T.P. "recognized the male from the bulletin *wearing the same clothes*. She immediately said that *she recognized the red jacket*."   (Dkt. No. 50, Attach. 30, at 27 [emphasis added].)   The testimony to the Grand Jury therefore emphasized that T.P.'s identification from the photos was not necessarily of Plaintiff himself, but of his clothes, particularly his red jacket.   Given that there had been testimony provided that T.P. described the clothes of the man who attempted to abduct her and the fact that officers recovered clothing, including a red jacket, that matched both T.P.'s original description (before she had ever seen any of the COPS Camera photos) and the clothing worn by the individual in the COPS Camera footage, the Court finds that no reasonable fact finder could conclude that this identification, even if unduly suggestive, would have materially affected the finding of probable cause, which, again, requires only a finding of probability related to whether Plaintiff committed the crimes encompassed by the charges being presented to the Grand Jury.   Moreover, Plaintiff has not offered any evidence to suggest that, just because the state trial court later found the identification process to be unduly suggestive, Defendant Henderson acted in bad faith when

either implementing the photo identification or by later testifying about the results of that process to the Grand Jury; the fact that the identification process was later found to be suggestive does not inherently mean that Defendant Henderson's actions were taken in bad faith.

The Court finds that the evidence presented to the Grand Jury was not improper and was sufficient to support the Indictment with probable cause as to all the charges. In particular, the following evidence was presented to the Grand Jury: (a) T.P. testified that the suspect was a light-skinned black man with hair on his face wearing a red jacket with a hood, jeans, and sneakers, that he pulled a weapon that was "black and curved at the bottom and it had dots" halfway out from his pocket, and that he tried to pull her away from the bus stop with him and told her "something bad" would happen if she did not go; (b) Defendant Henderson testified that T.P.'s description matched Plaintiff as seen in the COPS Camera footage and officers were able to positive identify him as the man in the footage when they encountered him at his sister's residence; (c) Defendant Cazzolli testified that, during the search of the residence pursuant to the search warrant, officers recovered a red zippered jacket with a hood, five knit black caps, light-colored blue jeans, a black belt, and black-and-white sneakers, all of which matched the clothing seen on the individual in the COPS Camera footage, and (d) Defendant Shannon testified that he found a folding knife in Plaintiff's pocket during the pat-down search incident to Plaintiff's arrest that was a "black handled, plastic trim folding knife, and at the bottom of one side had a circular design on the handle," which he described as a "small hole–like a silver hole–like a[n] almost, like a[n] ornamental or design to that knife. (Dkt. No. 50, Attach. 30, at 8-11, 18, 23-26, 32-33, 36-37.) This evidence is sufficient, taken together, to provide probable cause to support each of the four charges brought.

65

For all of the above reasons, Plaintiff's claims for malicious prosecution are dismissed.

**C.    Whether Plaintiff's Claim for Unreasonable Search (i.e., Part of His Third Claim) Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra,* Parts I.D. 1 & I.D.3 of this Decision and Order.   To those reasons, the Court adds the following analysis.

"Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may only issue upon a showing of probable cause." *Walczyk v. Rio*, 496 F.3d 139, 155 (2d Cir. 2007).   Under federal law, "probable cause to search is demonstrated where the totality of the circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"   *Walczyk*, 496 F.3d at 156 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 [1983]).   An individual may challenge the validity of a search warrant where "the affidavit supporting the warrant application contains deliberately or recklessly false or misleading information or material omissions of fact."   *United States v. Harrison*, 683 F.Supp.3d 184, 203 (N.D.N.Y. 2023) (Hurd, J.) (citing *United States v. McKenzie*, 13 F.4th 223, 236 [2d Cir. 2021]).

It is undisputed that a search warrant was signed and issued by Judge Rory McMahon at 1:30 PM on March 6, 2020.   (Dkt. No. 50, Attach. 27, at 1-2.)   This warrant covered the residence at 213 West Colvin Street, which is the second floor of a two-story house, and authorized officers to search for and seize various listed property of Darnell Williams.   (*Id.*) The search warrant application on which the warrant was granted included an affidavit from Defendant Shannon, in which he stated (1) officers responded to a report of an attempted abduction on March 2, 2020, where the victim, T.P., reported that "at approximately 0900hrs on

said date," "an unknown light skinned male" approached her at her bus stop and grabbed her to pull her away with him, whom she further described as being "approximately in his early 20's, wearing a red colored hoodie, blue jeans, and had a moustache," (2) officers found footage on the COPS Camera system showing a light skinned male wearing a red hooded sweatshirt with facial hair and a black hat walking in the area of Kirk Park at approximately 0901hrs, and who was later seen on the camera entering the residence at 213 West Colvin Avenue, (3) officers visited 213 West Colvin on March 6, 2020, and located Plaintiff, who "matched the physical description provided by the [victim] and further corroborated the description of the male observed in the area following the incident," and (4) "the victim positively identified the suspect observed on video surveillance as the suspect involved in the aforementioned incident."   (Dkt. No. 50, Attach. 27, at 5-6.)

In executing this search, police seized items including a red jacket, black knit hat, men's sneakers, and men's denim jeans that Plaintiff admitted wearing on March 2, 2022.   (Dkt. No. 50, Attach. 27, at 3.)   During a pat-frisk over the outside of Plaintiff's clothing performed incident to his arrest, Detective Shannon also found and recovered a folding knife from Plaintiff's right front pocket.   (Dkt. No. 50, Attach. 26, at 120-21.)

As to the search of the residence, Plaintiff argues that it was unlawful because the search warrant was not supported by probable cause.   (Dkt. No. 59, Attach. 2, at 23-25.)   As an initial matter, although the Court agrees with Plaintiff that the state trial court's pre-trial findings are not preclusive under the circumstances,[30] it nevertheless agrees with the conclusion reached by

---

[30]    *See Johnson v. Watkins*, 101 F.3d 792, 795-96 (2d Cir. 1996) (noting that, under New York law, pre-trial determinations that occur in the context where the individual is later acquitted should not be considered preclusive because the lack of opportunity to appeal such determinations following acquittal means the individual has not had a full and fair opportunity to

the state trial court judge, which is that the search warrant was valid even if T.P.'s identification in the photo array was unduly suggestive.   This is because the undisputed evidence shows that, even when not considering the photo array evidence, there was sufficient evidence on which the probable cause determination could be made.   This includes T.P.'s statements to officers regarding the attempted abductor's appearance (i.e., the red coat, jeans, sneakers, moustache, and the fact that he was a "light-skinned" man which has been explained as meaning a light-skinned Black man), the COPS Camera footage that showed an individual matching T.P.'s basic description of the attempted abductor near the relevant area around the time that the attempted abduction was believed to have occurred, and their physical meeting with Plaintiff at 213 West Colvin through which they identified him as the individual from the COPS Camera footage (all of which were included in Defendant Shannon's affidavit and considered by the judge who issued the warrant).

Plaintiff makes various arguments regarding the exact timing of the attempted abduction, minor potential inconsistencies between different interviews of T.P. (notably about her first identifying the attacker as being in his teens or twenties and then her later saying he was younger than her mother), and the failure of T.P. to mention certain obvious features of Plaintiff (i.e., his gold teeth and accent); but Defendant Shannon's failure to mention such facts does not amount to a falsification or omission of material evidence.   Moreover, probable cause does not require the type of exact certainty Plaintiff seems to argue for by asserting that such evidence was required to be disclosed to the issuing judge.   Rather, "the issue in warrant proceedings is not guilt beyond a reasonable doubt but probable cause for believing the occurrence of a crime and

litigate the matter); *accord Jenkins v. City of New York*, 478 F.3d 76, 91-92 (2d Cir. 2007).

the secreting of evidence in specific premises." *United States v. Harris*, 403 U.S. 573, 584

(1971); *see also Walczyk*, 496 F.3d at 156-57 (noting that, in probable cause determinations, the

"focus is on 'probabilities,' not 'hard certainties,'" and it "does not demand any showing that a

good-faith belief be 'correct or more likely true than false'").   Plaintiff's description, the COPS

Camera footage of an individual generally matching that description in the general area around

the time the incident occurred, and the officers' visual confirmation that Plaintiff was the same

person in the COPS Camera footage, were sufficient to support a probability that a search of 213

West Colvin would turn up relevant evidence related to T.P.'s attempted abduction.

Plaintiff specifically argues that Defendant Shannon made statements that he knew or

should have known were false in his affidavit in support of the search warrant application,

specifically that he "omitted from his affidavit statements that evinced T.P.'s description was

unreliable, and that showed Plaintiff was not at the scene of the incident." (*Id.* at 24.)

However, Plaintiff's assertions that T.P.'s descriptions were materially inconsistent or unreliable

do not accord with the evidence, nor can it be said that there was concrete evidence at the time

Defendant Shannon applied for the search warrant (or even now, on the record presented) that

Plaintiff was definitively not at the scene of incident, or other exculpatory evidence that would

have had any bearing on the probable cause analysis for issuing the search warrant; indeed,

Plaintiff does not specify precisely what "ample" and "materially exculpatory" evidence he

believes Defendant Shannon was required to include in his affidavit, and the statement that the

incident occurred at "approximately 0900hrs" in the affidavit is, as Defendants argue, generally

consistent with T.P.'s statement that it occurred at 9:04AM, and does not represent a materially

false statement that would merit invalidating the search warrant.   Because Plaintiff has not

identified any statements in Defendant Shannon's affidavit that were false or materially misleading, he has not shown any basis for finding that the search warrant was not supported by probable cause, and thus cannot succeed on his claim that the search of the residence was unlawful.

To the extent the search warrant (which included "any weapon or item similar in description that is adorned with decorative circles or holes") did not cover a search of Plaintiff's body in any respect, the pat-frisk performed by Defendant Shannon was nevertheless reasonable. There appears to be no dispute that this search was performed incident to a valid arrest, and that it involved only a pat-down of the outside of Plaintiff's clothes until Defendant Shannon felt the knife, at which point Defendant Shannon reached into Plaintiff's pocket to retrieve that knife. "Among the exceptions to the warrant requirement is a search incident to a lawful arrest," which "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009).   The Supreme Court has long held that "individual suspicion is not necessary, because '[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence,'" but rather "'[t]he fact of a lawful arrest, standing alone, authorizes a search.'" *Maryland v. King*, 569 U.S. 435, 449 (2013) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 35 [1979]).   Because Plaintiff does not dispute, but indeed conceded in his decision not to oppose dismissal of his false arrest claims, that the arrest warrant and arrest were valid, so too was the search performed incident to arrest that revealed the pocketknife.

For all of these reasons, Plaintiff's claim of unreasonable search is dismissed.

**D.      Whether Plaintiff's Claim for Denial of a Right to a Fair Trial (i.e., His Fourth Claim) Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra*, Parts I.D.1 & I.D.3 of this Decision and Order.

"The Due Process Clause guarantees a criminal defendant's 'right to a fair trial.'"   *Frost v. New York City Police Dept.*, 980 F.3d 231, 244 (2d Cir. 2020) (quoting *Ramchair v. Conway*, 601 F.3d 66, 73 [2d Cir. 2010]).   "This right is violated '[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.'"   *Frost*, 980 F.3d at 244 (quoting *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 [2d Cir. 1997]).   "[U]nlike a malicious prosecution claim, 'a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff.'"   *Frost*, 980 F.3d at 244 (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277-78 [2d Cir. 2016]). Stated plainly, probable cause is not a defense for a fair trial claim brought pursuant to the Fourteenth Amendment.

In support of this claim, Plaintiff asserts three arguments: (1) that Defendants Henderson and Picotte fabricated evidence by "manipulating/cajoling" T.P. into making a false identification; (2) that Defendants did not put T.P.'s statement that the incident occurred at 9:04 AM into any police reports; and (3) that Defendants Cazzolli and Shannon fabricated evidence by conducting a walking "simulation" to manufacture a timeline that supported their theory that Plaintiff was the attempted abductor.   (Dkt. No. 59, Attach. 2, at 20-23.)

As to Plaintiff's argument regarding the alleged false identification by Defendants Henderson and Picotte, Plaintiff has not shown that there is a genuine dispute of material fact

that could permit a finding that this evidence was fabricated or withheld in a manner that violated his right to a fair trial.   Defendant Henderson testified to the Grand Jury that, on March 6, 2020, she and Defendant Picotte presented T.P. with a photo array (which contained an image of Plaintiff), but that T.P. was unable to pick the suspect out of that array.   (Dkt. No. 50, Attach. 30, at 27.)   She proceeded to testify that they then showed T.P. pictures of Plaintiff from the law enforcement bulletin and T.P. "recognized the male from the bulletin wearing the same clothes. She immediately said that she recognized the red jacket."   (*Id.*)   Detective Henderson's report dated March 9, 2020, states that T.P. provided a positive identification on March 6, 2020, from still images taken from the law enforcement bulletin, noting that T.P. "confirmed the photos were the suspect wearing the same red jacket and blue jeans."   (Dkt. No. 50, Attach. 56, at 18.)

Plaintiff argues that this identification was unduly suggestive because (a) "Defendants were aware that T.P. was a child and easily prone to suggestion," and (b) Defendant Cazzolli (who was notably not involved in the identification process) "testified that showing a victim multiple photos of the same suspect at the same time would be overly suggestive."   (Dkt. No. 59, Attach. 2, at 21.)   Plaintiff's arguments on this matter ignore the fact that, even if the photo array can be considered to be suggestive, the evidence presented does not show that it was Plaintiff himself that T.P. recognized; indeed, T.P. has stated that she did not see much of the attempted abductor's face other than his facial hair and skin tone.   Rather, it was the clothes he was wearing in the bulletin photograph that T.P. recognized, particularly his red jacket.   The undisputed evidence shows that (a) T.P. consistently told officers that the man who attempted to abduct her was wearing a red jacket with a hood, and (b) Plaintiff was the only individual seen wearing a red jacket with a hood on the COPS Cameras located near the relevant area at

approximately the time of the attempted abduction.    When shown pictures of Plaintiff from the COPS Camera footage, T.P. "immediately" said she recognized the red jacket, according to Defendant Henderson.

Moreover, Plaintiff assumes that the mere fact that a piece of evidence might have been obtained through suggestive identification alone shows a violation of his right to a fair trial against Defendants Henderson and Picotte (as the two officers present for the relevant photo array).    However, under Second Circuit precedent, where a prosecutor makes an independent decision to prosecute the plaintiff and he or she was informed of alleged problems with the evidence, the act of bringing the prosecution is a superseding cause of the alleged harm suffered. *See Bermudez v. City of New York*, 790 F.3d 368, 374-75 (2d Cir. 2015) (citing *Wray v. City of New York*, 490 F.3d 189 [2d Cir. 2007]; *Townes v. City of New York*, 176 F.3d 138 [2d Cir. 1999]; *Myers v. Cnty. of Orange*, 157 F.3d 66 [2d Cir. 1998]).    Here, although Plaintiff has argued that Defendants failed to produce relevant evidence to the prosecutor, there is no admissible record evidence supporting that argument.

As to the specific evidence related to the circumstances of the identification the state court deemed to be suggestive, the undisputed record evidence shows that (a) the details of the manner in which the various photo arrays were conducted were included in the police reports, and (b) the prosecution knew that T.P. had been shown other photo arrays and then a few photographs of Plaintiff based on the testimony to the Grand Jury.    (Dkt. No. 50, Attach. 11, at 2-4; Dkt. No. 50, Attach. 30, at 20-31; Dkt. No. 50, Attach. 56, at 18.)    Because there is no admissible record evidence showing that any of the Defendants withheld pertinent information regarding the circumstances of the photo arrays from the prosecution, the prosecutors'

independent decision to prosecute Plaintiff is a superseding cause of any violation committed by the relevant Defendants.   *See Bermudez*, 790 F.3d at 374 ("Defendants can be held liable for violating Bermudez's due process rights if they 'misled or coerced the intervening decision-maker such that the decision-maker's conduct was tainted.'").   Thus, to the extent Plaintiff claims that he suffered a liberty interest by being incarcerated pre-trial, the intervening actions of the District Attorney's office was a superseding act that is fatal to his claim against the relevant Defendants. As to Plaintiff's argument that Defendants did not put T.P.'s initial statement that the attempted abduction took place at 9:04 AM into any police reports, Plaintiff has not shown that Defendants' actions related to that evidence represents any type of fabrication or withholding of evidence.   Notably, T.P.'s statement is captured on body camera footage that was available to the District Attorney's office, and Plaintiff has (in his response to Defendants' Statement of Undisputed Material Facts) admitted that such statement was disclosed to both the District Attorney's office and Plaintiff.   *See, supra,* Statement of Fact Numbers 228 and 229 in Part III of this Decision and Order.   In any event, Detective King's original police report related to officer response to the incident states that the attempted abduction occurred at "approximately 0900hrs."   (Dkt. No. 50, Attach. 5, at 5.)   This report was rendered at a time when officers had two conflicting statements regarding the timing of the incident, as discussed previously: T.P.'s unverified statement that it occurred at 9:04 AM, and her mother's then-contemporaneous statement that it occurred approximately 15-to-20 minutes before her 911 call of 9:10 AM.[31] Under the circumstances, no reasonable fact finder could conclude that this report was fabricated

---

[31]   Moreover, later uncovered evidence that substantiated the fact that the call T.P. made to her mother (during the attempted abduction) was received by Ms. Jones' phone at 8:57 AM, which supports Ms. Jones' statement in the 911 call and not T.P.'s unverified statement.

or the result of withheld evidence (especially given that, again, there is no evidence that the body camera footage containing T.P.'s statement was withheld from the District Attorney's office).

As to Plaintiff's argument that Defendants Cazzolli and Shannon fabricated evidence by conducting a walking "simulation" to support their theory of Plaintiff's presence at the Incident Location at the relevant time, in order to establish a claim of denial of a fair trial based on fabrication of evidence, the plaintiff must show that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir 2016) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 [2d Cir. 1997]).   Plaintiff argues that Defendants Cazzolli and Shannon fabricated their walking "simulation" (of Plaintiff walking from the place where the attempted abduction occurred at 8:57 AM to the location where he was next seen on camera at 8:59:51 AM) because (a) they did not create any report, videotape, pictures, or other evidence to substantiate that they conducted such a simulation, and (b) it is not possible that Defendants Cazzolli and Shannon could have walked the distance between the relevant locations (which Plaintiff claims to be 1,235.80 feet) at the pace that Defendant Cazzolli testified to in his deposition   (which was "a little under three" miles per hour) in the relevant amount of time (which Plaintiff claims was "a little under three minutes.").   (Dkt. No. 59, Attach. 2, at 16-18, 20, 22-23 [attaching pages "10," "11," "12," "14," "16" and "17" of Plf.'s Opp'n Memo. of Law].)

As Plaintiff argues, the conducting of this simulation does not appear to be corroborated by any report, videotape or pictures.   However, Plaintiff cites no authority for the point of law

that such a simulation needs to be corroborated where at least some admissible record evidence exists substantiating it.   Here, the fact that Defendants Cazzoli and Shannon conducted a walking "simulation" is substantiated by both the deposition testimony and trial testimony of Defendant Cazzoli, as well as the deposition testimony of Defendant Shannon.   (Dkt. No. 50, Attach. 13, at 147-52 [Cazzoli Dep. Tr.]; Dkt. No. 50, Attach. 46, at 89-90, 103 [attaching pages "312," "313" and "326" of Cazzoli's trial testimony]; Dkt. No. 50, Attach. 26, at 133-37 [Shannon Dep. Tr.].)

A closer question is presented by the deposition testimony of Defendant Cazzoli that Defendant Shannon and he conducted the walking "simulation" at a pace of "a little under three" miles per hour.   As a threshold matter, the Court must take issue with Plaintiff's argument that Defendant Cazzoli "testified" that Defendant Shannon and he did the walk "in a little under three minutes."   (Dkt. No. 59, Attach. 2, at 18 [attaching page "12" of Plf.'s Opp'n Memo. of Law, arguing that Cazzoli "testified" and "claimed" that Shannon and he did the walk "a little under three minutes"].)   Defendant Cazzoli did not do so; rather, he testified at trial, and in his deposition, that Shannon and he did the walk in "approximately three minutes" or "about three minutes."   (Dkt. No. 50, Attach. 46, at 89, 103 [attaching pages "312" and "326" of Cazzoli's trial testimony]; Dkt. No. 50, Attach. 13, at 148 [Cazzoli Dep. Tr.].)

The Court must also take issue with Plaintiff's suggestion that Defendant Cazzoli testified that Defendant and Shannon did their walk from the precise position of T.P.'s bus stop and the precise position of Plaintiff on the COPS Camera.   (Dkt. No. 59, Attach. 2, at 16-18 [attaching pages "10" through "12" of Plf.'s Opp'n Memo. of Law].)   Again, Defendant Cazzoli did not do so; rather, he testified at trial, and in his deposition, that Defendant Shannon

and he did their walk from "the intersection" of Landon and Borden Avenues to "the intersection" of McLennan and Midland Avenues.   (Dkt. No. 50, Attach. 46, at 89 [attaching page "312" of Cazzolli's trial testimony]; Dkt. No. 50, Attach. 13, at 139-40, 148 [Cazzolli Depo. Tr.].)

The Court must also take issue with Plaintiff's assertion that the distance between those two locations is 1,235.80 feet.   (Dkt. No. 59, Attach. 2, at 18 [attaching page "12" of Plf.'s Opp'n Memo. of Law].)   Plaintiff supports this assertion with a citation to Google Maps, of which he asks the Court to take judicial notice.   (*Id.*)   However, Plaintiff does not attach a copy of his Google Maps search result (as either an exhibit to an attorney's declaration or merely an image).   (*See generally* Dkt. Nos. 59 and 60.)   The Court's search of the Google Maps website cited by Plaintiff (http://google.com/maps/*dir*/ [emphasis added]) reports the distance between the two corners in question as ".2 mile" (equal to 1,056 feet) or "400 m[eters]" (equal to approximately 1,312.34 feet).   Moreover, when the "details" of the route are requested, a walker is directed to proceed 280 meters on McLennan Avenue and 100 meters on meters on Landon Avenue for a total of 380 meters (which equals approximately 1,246.72 feet).   It is only when the Court uses the "measure distance" feature of "http://google.com/maps/*place*/" (emphasis added) that the Court can calculate the precise distance in feet between the sidewalk at the northwest corner of Landon Avenue and Borden Avenues and the sidewalk at the southeast corner of McLennan and Midland Avenues.   However, according to the Court's measurements, the distance appears to be approximately 1,125.95 feet.[32]

---

[32]    The Court suspects that the difference between this calculation and Plaintiff's calculation (which amounts to 109.85 feet) is due to Plaintiff using, in his measurements, the precise location of T.P.'s bus stop (which the Court understands to be on Landon Avenue just south of Landon's intersection with Borden Avenue based on the red circle contained in Statement of Fact

Further, this distance estimate assumes use of the sidewalks and streets, whereas the evidence suggested that the suspect might have taken shortcuts, such as through yards. (Dkt. No. 50, Attach. 46, at 84 [in which Defendant Cazzolli testified at the criminal trial that the shoes found in Plaintiff's residence pursuant to the search warrant had dirt and grass on the bottom of them, and that a still photograph from the COPS Camera footage showed Plaintiff walking on grass at least once].) Additionally, although the suspect was not seen to be running on any of the COPS Cameras, there was an approximately three-minute period of time between the relevant locations when he was not recorded by any camera. Because there is no evidence to prove that the suspect could not have taken shortcuts on the grass or run part of the relevant distance, no reasonable factfinder could conclude that Defendants' simulation to determine the plausibility of covering that distance in the relevant time was falsified in a manner that contributed to any deprivation of liberty, given that all of these facts increase the plausibility that the suspect could have traversed the distance between the relevant locations within the approximately three minute period of time showed by both the video and the walking simulation.

Finally, the Court notes that the undisputed evidence shows that, at the criminal trial, Defendant Cazzolli did not provide any testimony regarding the speed of movement during the simulation, merely that he was walking and not running.[33] (Dkt. No. 50, Attach. 46, at 89-90.)

---

Number 209 in Part III of this Decision and Order, although T.P.'s mother stated in body cam footage that T.P.'s bus stop is on the "left" side of Borden) and the precise location of Plaintiff's position on the COPS Camera (which the Court perceives to be the curb of Midland Avenue, just south of Midland's intersection with McLennan Avenue).

[33]    Defendant Cazzolli's trial testimony on the simulation was as follows:

Q.    Have you had an opportunity to walk from the intersection of West Borden and Landon, north on Landon Ave, west on McLennan Ave to the intersection of McLennan and Midland?

Similarly, at his deposition, Defendant Shannon testified that they did the simulation at "an average pace, walking pace," without taking "any shortcuts using city sidewalks and streets." (Dkt. No. 50, Attach. 26, at 134-35.)    For all of these reasons, the Court finds that the fact that Defendant Cazzolli later estimated in his deposition (which was conducted nearly three years after the trial) that his normal walking pace is "a little under three" miles per hour when measured on a treadmill could not permit a reasonable factfinder to conclude that Defendant Cazzolli and Defendant Shannon fabricated the results of the simulation. [34]   (Dkt. No. 50, Attach. 13, at 175.)

In sum, there is no basis for a finding that any of the relevant evidence was fabricated.

### E.    Whether Plaintiff's Claim for Failure to Intervene (i.e., His Fifth Claim) Must Be Dismissed

---

A.    Yes, I have.
Q.    And approximately how long did that take?
A.    About three minutes.
Q.    Approximately three minutes?
A.    Yes.
Q.    And were you running?
A.    No, I was not.
Q.    Were you walking?
A.    Yes.
Q.    And were you able to get from West Borden and Landon Ave to McLennan and Midland in just a few minutes?
A.    Yes.   North on Landon Ave to McLennan and then westbound on McLennan Ave, yes.

(Dkt. No. 50, Attach. 46, at 89-90.)

[34]    Although this fact is not necessary for the Court's decision, the Court notes that, for Defendants Cazzolli and Shannon to have covered 1,125.95 feet in three minutes and fifteen seconds or 3.25 minutes (which is arguably still "approximately three minutes"), they would have had to travel at a pace of 3.94 miles per hour, which may still fairly be characterized as a walk, albeit a brisk one.

After careful consideration, the Court answers this question in the affirmative for the following reasons.

As discussed above, the Court finds that all of Plaintiff's constitutional claims must be dismissed.   Without a predicate constitutional violation, Plaintiff cannot assert a valid claim for failure-to-intervene.   *See Davis-Guider v. City of Troy*, 17-CV-1290, 2023 WL 2693438, at *12 (N.D.N.Y. Mar. 29, 2023) (Stewart, M.J.) (citing *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 [E.D.N.Y. 2012]; *Grinols v. Beers*, 532 F. Supp. 3d 95, 108-09 [W.D.N.Y. 2021]); *Livingston v. Hoffnagle*, 19-CV-0353, 2021 WL 3888283, at *6 (N.D.N.Y. Aug. 3, 2021) (Hummel, M.J.), report-recommendation adopted 2021 WL 3885247 (N.D.N.Y. Aug. 31, 2021) (Sharpe, J.) (noting that "[i]t is well settled that an underlying constitutional violation is a precondition of a failure-to-intervene claim") (internal quotation marks omitted).   Accordingly, Plaintiff's failure-to-intervene claim against the Defendants is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 50) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 11) is **<u>DISMISSED</u>**.

Dated:  March 4, 2025
        Syracuse, New York

Glenn T. Suddaby
U.S. District Judge